214 N.J. Super. 256 (1986)
518 A.2d 1110
INMAR ASSOCIATES, INC., PLAINTIFF-APPELLANT,
v.
BOROUGH OF CARLSTADT, DEFENDANT-RESPONDENT.
GAF CORPORATION, PLAINTIFF-APPELLANT,
v.
BOROUGH OF SOUTH BOUND BROOK, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued September 8, 1986.
Decided December 10, 1986.
*257 Before Judges J.H. COLEMAN, R.S. COHEN and GRUCCIO.
Edward J. Egan, attorney for appellant Inmar Associates, Inc. (Edward J. Egan and William J. Gianos, on the brief).
Langan and Lynch, attorneys for respondent Borough of Carlstadt (John J. Langan, Jr., on the letter brief).
*258 Steven R. Irwin argued the cause for appellant GAF Corporation (Mandelbaum & Mandelbaum, attorneys; Daniel D. Cronheim of counsel; Steven R. Irwin on the brief).
Richard D. Millet argued the cause for respondent Borough of South Bound Brook (Hampson & Millet, attorneys; Richard D. Millet of counsel and on the brief).
The opinion of the court was delivered by COLEMAN, J.H., J.A.D.
These cases present the troublesome question previously undecided in this State, whether commercial landowners are entitled to have the assessed value for municipal realty taxes reduced by the cost of cleaning up hazardous waste and materials to make the property environmentally safe. The judge in each case assumed, without deciding, that the assessed valuation may be reduced by the cleanup cost. In both cases the judges concluded, however, that the taxpayer failed to establish the cleanup cost as of the assessment dates. Hence, tax abatement was disallowed. We now affirm and hold that a commercial taxpayer is not entitled to a reduction in the assessed value based upon the cost required to make the property environmentally safe.

I. Inmar Associates, Inc. v. Borough of Carlstadt.

Inmar Associates, Inc. (Inmar) owned 5.938 acres of land in a heavy industrial area of the Borough of Carlstadt. As of October 1, 1982, the relevant assessment date, the land was assessed for $655,200 and the improvements were assessed for $48,200.[1] The assessment was affirmed by the Bergen County Board of Taxation. Inmar then filed an appeal with the Tax *259 Court seeking a determination of the true value of the property for assessment purposes. Both sides presented expert testimony as to true value. Both experts relied exclusively upon the market sales approach to valuation. The experts agreed that the property was contaminated by toxic substances as of the assessment date which made the property difficult, if not impossible to sell.
Scientific Chemical Processing, Inc. (SCP) received a temporary authorization from the Department of Environmental Protection (DEP) on May 9, 1978 to use the property to transfer, store, reprocess, reclaim, blend and treat solid and hazardous waste. Consequently, it stored hazardous chemicals and substances in above ground tanks while waiting to be recycled. Some of the waste and chemicals to be used in the recycling process leaked from tanks and contaminated the ground. SCP's operation was closed down by DEP's order of March 27, 1980 because SCP's temporary operating authorization issued by DEP pursuant to N.J.S.A. 13:1E-11 had expired on April 30, 1979 and permanent registration pursuant to N.J.S.A. 13:1E-15 had been denied.
The judge concluded that the presumption of correctness of the accessor and the County Board of Taxation had not been rebutted. See generally, Aetna Life Ins. Co. v. Newark, 10 N.J. 99, 105 (1952). The Borough did not establish the value because its expert utilized sales of properties that were not comparable to the taxpayer's property. The judge also found that the taxing district's expert made specific adjustments to the perceived comparable properties to make them similar to the taxpayer's property but gave no justification for the adjustments contrary to Schmertz v. Dover Tp., 4 N.J. Tax 145, 150 (Tax Ct. 1982). The judge further found that the Borough's expert utilized properties for comparison which were not contaminated by toxic wastes. For the same reasons, he concluded that the Borough had failed to establish true value by a preponderance of the evidence.
*260 Similarly, the judge found that Inmar did not establish true value. Inmar's expert fixed the value of the land at $742,250 and then deducted $450,000 as cleanup cost based upon an August 31, 1984 cleanup contract to satisfy the demands of DEP. That contract price did not include the cost of cleaning up polychlorinated biphenyl (PCB) from the site. No remedial investigation or feasibility study was conducted to determine the extent of contamination. The judge found that the 1984 cleanup contract was insufficient to establish cleanup costs as of the October 1, 1982 assessment date, and that it could not have been foreseen on October 1, 1982 that DEP would enter a cleanup order as the result of litigation instituted in May 1983. Hence, the judge found that "neither party has established the true value by a preponderance of the evidence." He therefore affirmed the County Board of Taxation's assessment of the land. We agree that Inmar failed to establish the cleanup cost of the property as of October 1, 1982, but under our decision that issue is not relevant.

II. GAF Corp. v. Borough of South Bound Brook

The parties stipulated in the Tax Court that the commercial property in question had a fair market value of $1.6 million as of the October 1, 1983 assessment date if the property were not contaminated with hazardous materials. The contamination was not disputed. Plaintiff sought a tax abatement based upon a reduction in the assessed value by the cost of rendering the property environmentally safe in accordance with the Environmental Cleanup Responsibility Act (ECRA), N.J.S.A. 13:1K-6 et seq.
The property involved in GAF's appeal consists of a number of older industrial and warehouse buildings. Commencing in 1913 the plant manufactured asphalt and asbestos roofing. Although the industrial complex was no longer used for manufacturing at the time of trial, it was then being used as a distribution center and warehouse. The hazardous materials which contaminated the property consist of unused raw materials, *261 asphalt, asbestos, and waste materials from the manufacturing process, machinery and equipment. Some of the unused raw materials and waste seeped from storage tanks into the ground.
Arthur Dresner, GAF's director of real estate, testified that he estimated a cost of $450,000 in 1983 to remove the debris and hazardous materials from the property. Dresner admitted that plaintiff had not received written estimates from potential contractors. He also admitted that with respect to some of the materials involved in a cleanup, accurate estimates would be impossible before conducting a sampling study which had not been performed. Dresner admitted that the $450,000 estimate was not sufficiently reliable to use when negotiating with potential purchasers of the property or when contracting for cleanup.
The Tax Court concluded that GAF failed to "establish[ed] the cost of complying with ECRA requirements" and denied the application for a reduction of the stipulated market value. We agree that GAF failed to establish by a preponderance of the evidence what the cleanup cost was as of the October 1, 1983 assessment date, but under our decision that issue is not relevant.

II. Consolidated Appeals.

Inmar and GAF have appealed urging essentially the same reasons for reversing the Tax Court. On our own motion we consolidate the appeals and decide both cases in one opinion. For the reasons which follow, we hold that neither Inmar nor GAF was entitled to deduct cleanup costs from the assessed value even if such costs had been established.
GAF argues that ECRA was applicable and that the valuation for tax assessment should have been reduced by the cleanup costs required by ECRA. We disagree. ECRA was enacted by L. 1983, c. 330 to provide for the expeditious cleanup of hazardous substances or wastes at industrial cites at the *262 time they are closed, sold or otherwise transferred. N.J.S.A. 13:1K-6 and 7; N.J.A.C. 7:1-3.7. ECRA took effect on September 2, 1983 but was to remain inoperative for 120 days. Hence, ECRA had not been enacted when Inmar's property was assessed on October 1, 1982. Likewise, ECRA was inoperative when GAF's property was assessed on October 1, 1983. Additionally, ECRA's cleanup is required only when there is a closure, sale or other transfer of the industrial property. See N.J.S.A. 13:1K-11(b). There had been no closure, sale or other transfer of GAF's property on October 1, 1983. That property was in use at the time of the assessment as a warehouse and distribution center for its products. Neither ECRA nor the statement of the Senate Energy and Environment Committee attached thereto indicates any intent to give the legislation retroactive effect. Absent a clear intent for retroactive application, the statute should be given prospective effect only. See State, Dept. Environ. Protect. v. Ventron Corp., 94 N.J. 473, 498 (1983).
Inmar argues that the influence of many other statutes related to the cleanup of toxic waste and hazardous substances combined to render its property worthless as of October 1, 1982. It refers to the Comprehensive Environmental Response, Compensation, and Liability Act; 42 U.S.C.A. 9601 et seq.; the Resource Conservation and Recovery Act, 42 U.S.C.A. 6901 et seq.; the Water Pollution Control Act, N.J.S.A. 58:10A-1 et seq., and its attendant regulations, N.J.A.C. 7:14A-1 et seq.; the Solid Waste Management Act, N.J.S.A. 13:1E-1 et seq. and its attendant regulations, N.J.A.C. 7:26-1 et seq.; the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 et seq.; the water quality legislation, N.J.S.A. 23:5-28; and the Environmental Rights Act, N.J.S.A. 2A:35A-1 et seq. In a complaint filed in the Chancery Division by DEP on May 5, 1983 to compel cleanup of Inmar's property and to compel it to pay damages for contamination of the air, water and ground, all but the first two statutes formed the statutory basis for the relief sought. *263 The August 31, 1984 cleanup contract was a result of this Chancery action.
Counsel have not provided us with any published New Jersey decision directly bearing upon whether the cleanup statutes may affect assessment values and our independent research has been to no avail. Another jurisdiction, however, has touched upon the issue. In the New Hampshire case of Appeal of Great Lakes Container Corp., 126 N.H. 167, 489 A.2d 134 (Sup.Ct. 1985), a commercial taxpayer sought an abatement of real property taxes because its land was contaminated with hazardous wastes. The taxpayer asserted that its involvement as a defendant in a hazardous waste lawsuit and the existence of contaminants on the property rendered the property unsaleable and thus worthless for tax assessment purposes. The taxpayer submitted an appraiser's report which determined the property to be of zero market value because it was unusable in the contaminated condition. The taxpayer conceded that the site would be cleaned up as a result of federal litigation which probably meant that the land would eventually have a future sale value. For the tax year in question, however, the taxpayer asserted that the land had no sale value "because any buyer `would be subject to being forced to pay $10,000,000 if they [the government] can't get the money from somebody else to clean it up....'" Id. The board of tax appeals rejected the taxpayer's claims on the ground that "the prospect of future benefit gave the property some sale value." Ibid. (emphasis added). Commenting upon this finding, the New Hampshire Supreme Court stated that "nothing prevented [the taxpayer] from agreeing to sell the land with transfer of title deferred until after completion of any court-mandated cleanup, thus freeing the buyer from any possible liability due to the contamination." Ibid. The court found that because the taxpayer had presented no evidence to indicate what "the present value of that future benefit" was, it had not met its burden of proof. Ibid. Based on that same reasoning we are persuaded that even in their contaminated condition, the properties in these cases have substantial *264 value because there is no suggestion that they cannot be cleaned up to the satisfaction of DEP. There are additional reasons, which are discussed later, for rejecting Inmar's argument.
N.J.S.A. 54:4-2.25 provides that "[a]ll real property subject to assessment and taxation for local use shall be assessed according to the same standard of value, which shall be the true value of such real property...." See also N.J. Const. (1947), Art. VIII, § I, par. 1(a). True value "means fair market value as of the assessment date." Kearny v. Division of Tax Appeals, 137 N.J.L. 634, 635 (Sup.Ct. 1948), aff'd, 1 N.J. 409 (1949). For tax assessment purposes "the true value" may represent the price in money which a willing buyer would pay a willing seller where neither is obligated to buy or sell. Hackensack Water Company v. Borough of Old Tappan, 77 N.J. 208, 213 (1978); N.J.S.A. 54:4-23. The willing buyer, however, is a hypothetical one in a hypothetical sale. Turnley v. Elizabeth, 76 N.J.L. 42, 44 (Sup.Ct. 1908); see also CPC Int'l v. Bor. of Englewood Cliffs, 193 N.J. Super. 261, 268 (App.Div. 1984); ITT Cont. Baking Co. v. East Brunswick Tp., 1 N.J. Tax 244 (1980). But the price a willing buyer would pay a willing seller is "in no wise the exclusive criterion of true value." Rek Investment Co. v. Newark, 80 N.J. Super. 552, 559 (App.Div. 1963). While we recognize that cleanup costs may be high, the "[m]ere costliness [of construction or cleanup] cannot rationally be made the basis of exemption from taxation." Turnley, supra, 76 N.J.L. at 44.
Here, although the cleanup cost may be reflected to some extent in a hypothetical sale, the contamination was self imposed rather than imposed by government, and this makes the landowner no different from a builder who erects a building that is so costly that only a wantonly extravagant buyer would want to purchase. Ibid. Where there has been a diminution of a hypothetical sale price due to unreasonable construction costs or contamination by hazardous materials "[s]uch sale at a *265 discount is entitled to no evidential weight in ascertaining what `a willing buyer would pay a willing seller'...." Town of Secaucus v. Damsil, Inc., 120 N.J. Super. 470, 474 (App.Div. 1972), certif. den. 62 N.J. 90 (1972). Similarly, we do not perceive that the legislature intended for cleanup statutes to affect "the true value" of such real property for assessment purposes. We hold that the cleanup cost is irrelevant in determining true value for assessment purposes within contemplation of N.J.S.A. 54:4-2.25.
Inmar further asserts that the regulatory effect of hazardous substances and waste legislation "run[s] with the land" and should be taken into account when determining the true value of the property. It argues that the cost of mandatory cleanup should be viewed as a business repair and should be considered in determining the true value of the subject property. Inmar analogizes its situation to those involving government police power restrictions: sewer requirements, Town of West Orange v. Estate of Maclyn Goldman, 2 N.J. Tax 582 (1981); the impact of a flood hazard area designation on building development, Halocarbon Products v. Boro. of South River, 1 N.J. Tax 294 (1980), aff'd 181 N.J. Super. 1 (App.Div. 1981); and a government-imposed building moratorium, Cappture Realty Corp. v. Bd. of Adj. Elmwood Pk, 126 N.J. Super. 200 (Law Div. 1973), aff'd 133 N.J. Super. 216 (App.Div. 1975). See also Englewood Cliffs v. Estate of Allison, 69 N.J. Super. 514, 529 (App.Div. 1961) (holding that there should be a deduction when assessing land which has been burdened by a restrictive covenant or easements for the benefit of the general public or another property).
The principles we distill from these cases are not helpful to appellant. All of the burdens placed upon the lands in those cited cases were imposed voluntarily by the owner or by government for the benefit of the general public. For instance, in Allison, which involved an easement for the public's benefit, the value of the servient property was reduced because it was burdened with the public right to use and enjoy the land as a *266 public park. Therefore, when a property interest has been transferred to the public or to another's property for the benefit of another or for the public's benefit, the transferred property (the servient estate) should be excluded from the grantor's remaining property for tax assessment purposes. See Village of Ridgewood v. Bolger Foundation, 104 N.J. 337, 340 (1986); In re Appeal of Neptune Tp., 86 N.J. Super. 492, 499-500 (App.Div. 1965); Allison, supra, 69 N.J. Super. at 530-531. Also, when a private easement appurtenant is created, the servient property's assessment may be reduced because the servient estate may be less valuable and the value of the property which benefited from the easement (the dominant estate) has been enhanced generally. Lipman v. Shriver, 51 N.J. Super. 356, 360 (Law Div. 1958). Appellants in the present cases have not transferred any property interest to the public or to any other property. On the contrary, they have created health hazards to the general public and seek to transfer the remedial burdens to the public in the form of tax abatement.
Additionally, we believe that hazardous waste contamination is sui generis involving as it does, an unusual threat to health and safety of the public. See Ventron, supra, 94 N.J. at 493; Restatement, Torts 2d, § 519, comment d (1977). Basically, where police power is involved, government action is undertaken for the public good. Where the situation involves privately created contamination, remedial action is required because the private party intentionally or unintentionally disregarded the public good. It would indeed be incongruous for the Legislature to enact strict liability provisions for cleanup of hazardous wastes as it has done and at the same time intend that a polluter's tax assessment may be reduced because of the contamination. That would tend to encourage rather than discourage polluting which would be contrary to the legislatively formulated public policy of protecting the environment against toxic pollution. We do not perceive any legislative intent to permit an owner-created exemption to taxation based upon contamination by an owner or its tenant. Polluters can *267 hardly complain of lowered fair market values to a hypothetical buyer because of contamination, which is caused by the business activities of the landowner or its commercial tenant. In the present cases it was the contamination and not the cleanup legislation which lowered the land values in the eyes of hypothetical buyers.
Special circumstances may increase or depress market value without affecting the corresponding true value of property for assessment purposes. Switz v. Middletown Tp., 23 N.J. 580, 596 (1957); Rek Investment Co., supra, 80 N.J. Super. at 559. The special circumstance in both of the present cases is the contamination which has a tendency to depress potential selling prices. But the depressed potential selling prices are most likely temporary in nature because the hazardous waste removal statutes contemplate successful cleanup. "Value for the purpose of taxation has some measure of permanency which renders it secure against general temporary" conditions such as inflation or deflation. Ibid. We perceive no reason why the same should not apply to the contamination involved here.
The Inmar property became contaminated by its tenant, the recycling and reclaiming business of which was designed to bring hazardous waste onto the land. The land became contaminated as the result of SCP's commercial enterprise, which was apparently no secret to Inmar. The legislature intended that the landowner, not the taxpayers, should cleanup hazardous waste created by it or its tenants through the operation of private business conducted on the premises for profit. The commercial landowner could have and should have factored into the rental value or its operating expenses the financial responsibility to avoid contamination or the cleanup costs required after contamination. See Note, The Environmental Cleanup Responsibility Act (ECRA): New Accountability for Industrial Landowners in New Jersey, 8 Seton Hall Legis.J., 331 (1984-85). Our cleanup statutes impose strict liability on the landowner *268 and the tenant because of the special and highly dangerous character of hazardous waste. We believe, as did the legislature, that "[t]hose who poison the land must pay for its cure." Ventron, supra, 94 N.J. at 493; see also Note, Allocating the Costs of Hazardous Waste Disposal, 94 Harv.L.Rev. 584, 586, 604 (1981). Financial responsibility for the cleanup, without tax abatement, furthers this objective and at the same time encourages proper disposal of toxic waste and other dangerous materials.
Finally, we observe that ECRA and the Spill Compensation and Control Act create liens against the contaminated property for cleanup costs. See N.J.S.A. 13:1K-12; N.J.S.A. 58:10-23.11f(f). Landowners are made liable for cleanup costs of pollution caused by their tenants. Ventron, supra, 94 N.J. at 502. Even if taxpayers were to pay for cleanup costs in the form of tax abatement, the taxing district would be entitled to seek reimbursement for lost tax revenues from the Spill Compensation Fund which would be subrogated to the claim against the polluting landowner for the loss of tax dollars. See N.J.S.A. 58:10-23.11g(a)(4) and 10-23.11q; Tree Realty, Inc. v. Department of Treasury, 205 N.J. Super. 346, 348-349 (App.Div. 1985). These statutory liens for cleanup costs are not dischargable in bankruptcy under 11 U.S.C.S. § 727. See Ohio v. Kovacs, 469 U.S. 274, 285, 105 S.Ct. 705, 712, 83 L.Ed.2d 649, 660 (1985) (O'Connor, J., concurring). Thus, after a good deal of bookkeeping, the landowners would still have to pay for the loss of tax dollars due to any tax abatement allowed because of contamination.
We therefore hold that the owner of commercial land contaminated by hazardous waste or substances is not entitled to have the taxable value of that property reflect the cleanup costs or the cost of other remedial action. Nor is such a landowner entitled to have a "taint" factor considered after cleanup or other remedial action has been taken. The property must be assessed as if it were free of hazardous contamination.
The judgments of the Tax Court are affirmed.
NOTES
[1] In the Tax Court the parties stipulated that $26,200 represented the assessed value of the improvements. The judgment of the Tax Court provides $20,000 as the value for improvements. The judgment should be corrected accordingly.