INMAR ASSOCIATES, INC., PLAINTIFF–APPELLANT, v. BOR-
OUGH OF CARLSTADT, DEFENDANT–RESPONDENT.

GAF CORPORATION, PLAINTIFF–APPELLANT, v. BOROUGH
OF SOUTH BOUND BROOK, DEFENDANT–RESPONDENT.

Argued February 29, 1988—Decided October 13, 1988.

594

*Edward J. Egan* argued the cause for appellant Inmar Associates, Inc. (*Edward J. Egan,* attorney; *Edward J. Egan* and *William J. Gianos,* on the brief).

*Steven R. Irwin* argued the cause for appellant GAF Corporation (*Mandelbaum & Mandelbaum,* attorneys; *Waldron Kraemer,* of counsel; *Steven Irwin* and *Waldron Kraemer,* on the brief).

*Richard D. Millet* argued the cause for respondent Borough of South Bound Brook (*Hampson & Millet,* attorneys; *Alan L. Brodman,* on the brief).

*John J. Langan, Jr.,* argued the cause for respondent Borough of Carlstadt (*DeCotiis & Pinto,* attorneys).

*Harry Haushalter,* Deputy Attorney General, submitted a brief on behalf of *amicus curiae* Director, Division of Taxation (*Cary Edwards,* Attorney General of New Jersey, attorney; *Michael R. Clancy,* Deputy Attorney General, of counsel).

*John E. Garippa* submitted a brief on behalf of *amicus curiae,* Mellen Chemicals, Inc. (*Garippa & Trevenen,* attorneys; *Calvin O. Trevenen* and *Philip J. Giannuario,* on the brief).

*Mary C. Jacobson,* Deputy Attorney General, submitted a brief on behalf of *amicus curiae* New Jersey Department of Environmental Protection (*Cary Edwards,* Attorney General of New Jersey, attorney; *Michael R. Clancy,* Deputy Attorney General, of counsel).

*Brian J. Kelly* submitted a brief on behalf of *amicus curiae* The New Jersey State Bar Association (*Mr. Kelly,* on the brief).

*Saul A. Wolfe* submitted a brief on behalf of *amici curiae* New Jersey State League of Municipalities and Association of Municipal Assessors of New Jersey (*Skoloff & Wolfe,* attorneys).

The opinion of the Court was delivered by

O'HERN, J.

This appeal concerns the proper method for determining the assessed value of real property subject to governmentally-imposed requirements for environmental cleanup. We agree with the courts below that neither case presented an adequate basis under proper appraisal techniques for reaching the correct value by the simple expedient of deducting the estimated cost of such cleanups from the municipality's assessed valuation of the lands. We find, however, that the proofs in the *Inmar* case raised a sufficient challenge to the correctness of the municipal assessment to require the Tax Court to exercise its independent judgment as to value. We remand that case to the Tax Court for further proceedings. We affirm the *GAF* case.

I

The issue arises in the context of two taxpayers contesting the assessment of industrial properties. The facts of each case are set forth in the reported opinions below. We shall recite them briefly.

The GAF Corporation had operated an asphalt siding plant for many years at its South Bound Brook facility. For a variety of reasons the site became industrially obsolete. Although the plant was in use during the year in question, the company contemplated that it might remove the plant from service and sell the land. Thus, GAF sought a study to fix an asking price for the property. Over the years the hot tar used in the manufacturing process had found its way onto the land. "The entire surface of the site * * * has an oily surface or an oily slick to it as the result of that asphalt being on and around those tanks." Under the Environmental Cleanup Responsibility Act (ECRA), *N.J.S.A.* 13:1K–6 to –14, GAF would be required to clean up the property prior to its sale. *See generally* Rodburg, *General Environmental Regulations on Business Transactions in 1987* (1987) [hereinafter Rodburg] (for an overview of ECRA requirements).

The assessment in contest was for the tax year 1984 and thus of the October 1, 1983, value. The entire GAF property in South Bound Brook had a total assessment of $2,263,800, broken up into seven distinct lots and blocks. Of primary concern, however, is one lot—the site of the asphalt plant concerning which the taxpayer stipulated that absent chemical contamination, the property would be worth $1,600,000. GAF argued that the costs to comply with the ECRA requirements should be considered when assessing the land. GAF's Director of Real Estate had estimated costs to comply with ECRA requirements to be at a minimum of $450,000. This figure included expenses for: asbestos cleanup—$225,000; asphalt cleanup—$100,000; removal of contaminated tanks—$100,000; and sampling study—$41,000. The municipality disagreed with GAF's contention that the $450,000 cleanup cost should be a direct deduction from the stipulated tax assessment.

The taxpayer appealed and sought from the Tax Court "an opinion dealing with the public policy questions of how ECRA cleanup costs should be treated in a tax assessment and whether it had any application to tax year 1984." ECRA had been enacted on September 2, 1983, L.1983, c. 330, but remained inoperative for 120 days. In its unreported opinion, the Tax Court found that it was "unable to quantify the effect that compliance with ECRA requirements would have had on the market value of the property on the assessing date," and thus did not address the broader question posed by the taxpayer. The court concluded that the statements made by the GAF Director of Real Estate merely represented "rough estimates based on an inspection of the property but without a sampling study. There is no evidence of a cleanup plan approved by the Department of Environmental Protection."

GAF appealed to the Appellate Division, which scheduled the case for disposition with the *Inmar* case, which posed similar issues.

*Inmar* involved an appeal of the 1983 assessment of a 5.9–acre tract of land located in the Hackensack Meadowlands near the Sports Complex. It is an undeniably choice location suited for light industrial use and, under a special exception permit, may be suited for office, commercial, or hotel uses. As such, the land would have an immediate development potential but for its prior use as the site of Scientific Chemical Processing Company's (Scientific) industrial solvent recovery operations. (Scientific was a tenant of Inmar.) Abandoned by Scientific, the site had been placed on the federal Superfund list, under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 *U.S.C.* §§ 9601 to 9675. No cleanup had taken place at the time of the assessment.

Scientific's operations terminated in 1980 after the New Jersey Department of Environmental Protection (NJDEP) revoked the company's authority to operate due to regulatory violations. Sixty-seven stationary tanks and numerous tank wagons were abandoned on the site by Scientific. Evidence was presented that these tanks, which were leaking, contain various chemical wastes and solvents. In 1983, the NJDEP filed suit against Scientific and Inmar to require a cleanup of the site. In that action, the NJDEP became custodian of the property and impressed liens on the assets of Inmar for payment of the cleanup costs. In all, 150,000 gallons of liquid waste and 2,000 to 2,500 tons of solid chemical waste were found abandoned on the site. Inmar estimated the cost to strip the soil of contamination to be in excess of two million dollars—in addition to the $500,000 estimated cost for removal of the above-ground tanks, tank wagons, and the material inside.

The municipal assessor refused to hazard any opinion on what the cost would be, but like GAF, Inmar equally was unable to ascertain the full extent of the cleanup cost at the assessment date because neither the exact degree of contamination nor the level to which the contamination would have to be

cleaned up on the site had been determined by any governmental agency.

Inmar argued that the property was unmarketable and therefore should be regarded as having no value or, in the alternative, that Inmar's cleanup costs are "in the nature of repairs," and should therefore "be deducted dollar for dollar from the value of the property to reach a correct assessment." Hence, Inmar sought to have deducted the $450,000 minimum costs of the removal of the abandoned above-ground tanks and tankers, the waste contained therein, and the visible leakage and spillage. In its words: "That is all in the inexact art of groping for true value that Inmar asked the Tax Court to accept." The Tax Court refused to allow the deduction for costs calculated from a 1984 contract, and affirmed the assessment (approximately $60,000 an acre for Meadowlands commercial property) because it found that as of October 1, 1983, of the assessment year, no firm or fixed obligation to do restoration work had been incurred. *Inmar Assocs. v. Borough of Carlstadt,* 7 *N.J.Tax* 482, 490 (Tax Ct.1985).

On appeal, the Appellate Division affirmed the judgment of the Tax Court in both cases. *Inmar Assocs. v. Borough of Carlstadt,* 214 *N.J.Super.* 256 (1986). In the view of the Appellate Division, the condition of the land was to be viewed as one temporary in nature and not affecting the long-term value of the property. *Id.* at 264. The court also reasoned that "hazardous waste contamination is *sui generis* involving as it does, an unusual threat to health and safety of the public," and that allowing a deduction for the cost of cleanup "would be contrary to the legislatively formulated public policy of protecting the environment against toxic pollution." *Id.* at 266.

We granted the taxpayers' petitions for certification 108 *N.J.* 221 (1987).

II

As the Court noted in *Ayers v. Jackson Township,* 106 *N.J.* 557, 579 (1987), we are but beginning to

appreciate the unraveling "complexities of industrialized society * * *. One facet of that problem is represented here, in the form of years of inadequate and improper waste disposal practices." The question presented is how to reflect the costs of those inadequate and improper waste disposal practices in the current assessed values of land.

We begin with the constitutional bedrock that all real property dedicated to municipal tax purposes must be "assessed according to the same standard of value." *N.J. Const.* of 1947 art. VIII, sec. 1, para. 1. The Legislature has effectuated that imperative by the criterion of assessment at "true value." *N.J.S.A.* 54:4-2.25. We would be no more able to alter that standard to effectuate environmental policy than is the Legislature able to alter that standard to effectuate economic policy. *See New Jersey State League of Municipalities v. Kimmelman,* 105 *N.J.* 422, 438-39 (1987). Each branch of government must yield to the constitutional imperative.

Among the federal and state programs that impose burdens on present and past owners of land to maintain its environmental quality are the Comprehensive Environmental Response, Compensation, and Liability Act, 42 *U.S.C.* §§ 9601-9675 (CERCLA); the Resource Conservation and Recovery Act (RCRA), 42 *U.S.C.* §§ 6921-6931; the New Jersey Spill Compensation and Control Act (the Spill Act), *N.J.S.A.* 58:10-23.11 to -23.24, which imposes on landowners the obligation to clean their lands of pollution (*see In re Kimber Petroleum Corp.,* 110 *N.J.* 69 (1988)); and the Environmental Cleanup Responsibility Act, *N.J.S.A.* 13:1K-6 to -14, which is the centerpiece of this litigation.

■ There will be no avoiding the economic effect of these regulatory programs. They will undoubtedly affect the true value of real property. Both municipalities argued, however, that the effects on value must be disregarded. South Bound Brook urged that "in attempting to reach true value, public policy must be considered." In short, it argued that environ-

mental policy dictates a departure from the constitutional mandate of assessment of all property at true value substituting a balancing test that would balance the public concerns, i.e., the environmental concerns, against all assessments of true value.

Although we are sympathetic to the argument when the public concerns are so stark, the New Jersey Constitution affords us no discretion to balance the interests. Even when the salutary public concern includes as laudable a policy as preservation of farmlands, we are not free to balance that policy against the constitutional demand that property be assessed at true value. *Switz v. Township of Middletown*, 23 *N.J.* 580, 592–93 (1957).

But neither of these records unerringly points to the way in which value will be affected. The evidence simply did not address that question. By imposing on current and past owners and users of land the cost of restoring the land, the regulatory programs perhaps have shifted costs but not values. Had government remained indifferent to the problem, it might better be argued, as Inmar contends, that the land is indeed worthless and that the industrial users conceivably would have stripped it of all value. But government's response to the years of inadequate and improper waste disposal has been an increasing effort to salvage that land and restore it to useful life. How successful society shall be in this endeavor remains to be seen.

An example or two will suffice to explain the interplay between cost and value. Without intending to disparage the conduct of Inmar or its tenant, let us assume for example that Scientific had been operated with extremely high standards of industrial cleanliness. That company perhaps would have incurred increased costs for its increased attention to the environmental maintenance of its property. In 1982, if the company had chosen to sell its clean plant site for a bank or a hotel servicing the Meadowlands, the present value of the property

would be great but at the sacrifice of the landowner's profits from cleanup incurred over the years.

The bottom line would be the same for the company that deferred its property maintenance until it sought to sell the land. In either case the cost must be incurred either as you go or before you sell. In neither case would the price that a willing buyer would pay to the willing seller be different. The true value or the market value would be the same. The use of such an example may seem unjust or unfair to an innocent owner such as Inmar which had leased the land to Scientific and presumably had no control over Scientific's practices. *See also State, Dep't of Envtl. Protection v. Ventron Corp.*, 94 *N.J.* 473 (1983) (subsequent purchaser of land may be responsible to clean up pollution of prior owner).

Hence, in the course of the Tax Court trials, the parties groped for analogies that would guide the court to its conclusion. Inmar stressed that the problem must be viewed as one of comparables, the comparison being between three lots similarly situated for acquisition in a development, but one with a deep hole on it. Would not that lot command a lesser price requiring, as it did, much fill to make it useful? Would not the market reflect that cost? Another example is that of an apartment with deferred maintenance that required roof repairs. Would that not be reflected in the market price?

While these examples were instructive, none yielded a fully accurate analogy. The optional cost-shifting that each example contemplates assumes a regulatory neutrality that does not exist in this context. The seller cannot avoid the cost of cleanup, but cost is not invariably equated with value. South Bound Brook's assessor was of the view that the fact that the industrial operator did not reserve the cost of cleanup over the life of the asset's use should not subtract from its value. An extended colloquy between the Tax Court and South Bound Brook's expert sought to test the premise. Questions posed were whether one would pay the same for a car with four good

tires as for a car with four bad tires (again the example was not instructive: environmental regulations do not permit the sale of environmentally damaged land); would one deduct the cost of necessary roof repairs from an apartment's value; would the cost of cleaning up the non-toxic granules of stone on the property be a deduction in value? In the face of such questioning the expert maintained that a program such as ECRA affects the value of land in the sense of profitability to the seller but not the value of the land in relationship to the market.

Although seeming to point in two directions, principles of federal law support the expert's concept. The financial obligation of a business entity to clean up pollution may be regarded as a debt of the entity. As such, the debt is dischargeable in bankruptcy. *Ohio v. Kovacs*, 469 *U.S.* 274, 105 *S.Ct.* 705, 83 *L.Ed.2d* 649 (1985). At the same time the obligation may remain a lien against the property, *id.* at 286, 105 *S.Ct.* at 711, 83 *L.Ed.*2d at 660 (O'Connor, J., concurring), and the property itself may not be abandoned by a trustee in bankruptcy. *Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection*, 474 *U.S.* 494, 506, 106 *S.Ct.* 755, 762, 88 *L.Ed.*2d 859, 869 (1986). The responsibility of cleanup is thus viewed as a financial obligation of the property owner; but the property itself remains within the control of its original owner and possibly subject to the cleanup lien. How then should these forces be viewed as market factors? If a purchaser buys property and assumes the mortgage of the seller, although little cash is received by the seller, the market value reflects the obligation of the purchaser to assume the debt. Would a purchaser's assumption of the obligation to clean up property reflect the same market reality?

█ The difficulty in this case is that all of these theories are but hypotheses. Each case presented a very inadequate record on which to posit a critical theory of valuation of property. Commentators recognize the "growing pains" of ECRA and the

difficulties in the assessment of environmental contamination. Ashkinaze, *Coping with ECRA's Growth—Large Caseload, Staffing at Issue,* 121 *N.J.L.J.* 642 (1988); *see* Rodburg, *supra,* at 99, 120–23. There is a very subtle composite of interests in these cases. On the one hand, all interests in land must be valued for tax purposes. The fact that property is of less value in the hands of one person because of the prior use of the property does not have a conclusive effect on the proper determination of the assessed valuation of the property. *Transcontinental Gas Pipe Line Corp. v. Bernards Township,* 111 *N.J.* 507, 520 (1988) (depreciation of property taken by property owner does not diminish value of the property, which "in fact has a significant value to the consumers that would not be reflected in the purchase price paid by an investor"); *see also In re Appeal of the Township of Neptune,* 86 *N.J.Super.* 492, 500 (App.Div.1965) (deed restrictions not considered in assessing market value for tax purposes). On the other hand, "governmental restrictions may affect the value of real property for property tax purposes." *Schwam v. Township of Cedar Grove,* 9 *N.J.Tax* 406, 412 (Tax Ct.1987) (citing *State v. Gorga,* 26 *N.J.* 113, 116–17 (1958); *State v. Wildlife Preserves, Inc.,* 134 *N.J.Super.* 287, 288–89 (App.Div.1975); *Sage v. Bernards Township,* 5 *N.J.Tax* 52, 70 (Tax Ct.1982), *aff'd,* 6 *N.J.Tax* 349 (App.Div.1984) (all zoning regulations); *Riorano, Inc. v. Weymouth Township,* 4 *N.J.Tax* 550, 566 (Tax Ct.1982), *aff'd,* 6 *N.J.Tax* 253 (App.Div.1983) (Pinelands development controls); *Town of West Orange v. Goldman's Estate,* 2 *N.J.Tax* 582, 588 (Tax Ct.1981) (sewage disposal requirements); *Halocarbon Products Corp. v. Borough of South River,* 1 *N.J.Tax* 294 (Tax Ct.1980), *aff'd and remanded,* 181 *N.J.Super.* 1 (App.Div.1981); *City of Newark v. Vernon Township,* 1 *N.J.Tax* 90, 100–02 (Tax Ct.1980), *aff'd,* 179 *N.J.Super.* 332 (App.Div.1981) (both flood plain regulations)). But when the governmental restraints are temporary or subject to cure, the transitory absence of a market does not eliminate value. *Town of West Orange v. Goldman's Estate, supra,* 2 *N.J.Tax* at 588 (value

depends on whether restrictions on use can reasonably be removed "in the foreseeable future.") (citing *New Jersey Turnpike Auth. v. Bowley,* 27 *N.J.* 549 (1958)).

Where exactly environmental cleanup cases fit in such a spectrum was not fully developed in these cases. One thing is certain: the methodology for resolving the question is not simply to deduct the cost of the cleanup from a putative value of the property. That would reflect only the cost accounting practices of the current owners. For example, if an owner borrowed the funds to clean up before the October 1 assessment date, and did clean up, that debt would not reduce the value of the property. On the other hand, if the property is unmarketable because of its condition, consideration must be given to the realistic likelihood that the owner will be able to cure the condition. Simply because cleanup costs will affect the owner's profits does not, however, automatically require a reduction in the tax assessment. An owner's expenditures of cost are "never conclusive on the question of value for tax purposes;" *Dworman v. Borough of Tinton Falls,* 1 *N.J.Tax* 445, 455 (Tax Ct.1980), *aff'd,* 180 *N.J.Super.* 366, 3 *N.J.Tax* 1 (App.Div.), *certif. denied,* 88 *N.J.* 495 (1981) (quoting *Borough of Haworth v. State Board of Tax Appeals,* 132 *N.J.L.* 306, 308 (1945)); and "[m]ere costliness, therefore, cannot rationally be made the basis of exemption from taxation." *CPC Int'l, Inc. v. Borough of Englewood Cliffs,* 193 *N.J.Super.* 261, 268 (App. Div.1984) (quoting *Turnley v. City of Elizabeth,* 76 *N.J.L.* 42, 44 (Sup.Ct.1908)). Just as government has regulated the amount of profit that a regulated utility may receive from a particular property, so government may, by its regulatory programs, affect the profits that may be received from the use of property. Such an example would be a municipality that closely regulates the property maintenance of apartment houses. In such a case the requirements for continual maintenance might result in less short-term profit to an owner but not in less value to the land.

On the other hand, if the effect of these federal and state regulatory programs is to produce the market consequence of driving down the value of commercial property potentially subject to cleanup costs, the effect of those market forces cannot be ignored in the assessment process simply because it would be counter to the environmental policy.[1] Rather, the question that remains to be tested is whether a strong environmental cleanup policy will drive real estate values up or down.

It strikes us that it may be helpful for appraisers to view these properties as they do special purpose properties using a measure of flexibility that will aid in the determination of the "true value" of contaminated properties. *See generally Sunshine Biscuits, Inc. v. Borough of Sayreville*, 4 *N.J.Tax* 486, 496–98 (Tax Ct.1982) (industrial facility not truly unique and thus subject to market data approach); *Twin Oaks Assocs. v. Town of Morristown*, 9 *N.J.Tax* 386, 394–96 (Tax Ct.1987) (nursing home is better viewed as special purpose property). Generally, when "there is no market" for the property, a property may be so classified. *Sunshine Biscuits, supra*, 4 *N.J.Tax* at 495. So too here, conventional market theories are not readily adaptable to the environmental setting. The combination of owner-responsibility and owner-liability does not fit the analogy to the slum landlord or the hole-in-the-ground.

Even then, the "courts have been reluctant to totally abandon the market value concept in the valuation of special-purpose properties; instead, they tend to relax the rules of evidence and comparability in evaluating these properties." J. Eaton, *Real Estate Valuation in Litigation* 171 (1982) [hereinafter J. Eaton]. "The three classic approaches to value used in

---

[1]The Legislature appears to have recognized that this might happen by allowing taxing districts to claim limited reimbursement from the Spill Fund for lost tax revenues attributable to the pollution of land. *N.J.S.A.* 58:10–23.-11g(a)(4). The Fund in turn is expected to recover these lost revenues from the polluter. *N.J.S.A.* 58:10–23.11q. But this provision, speaking of relief for one year, appears to contemplate the prototype of a one-time oil spill. *N.J.S.A.* 58:10–23.11g(a)(4).

the appraisal of real estate [cost, market data, and income approach] all have severe limitations when applied to special-purpose properties due to the absence of adequate market data." *Ibid.*

Among the suggestions are consideration of value to the owner even if there is no market. In the South Bound Brook case, even though ECRA might have prevented sale of the property on the assessment date, the property had a distinct "value in use" to the owner so long as the owner continued to operate the facility. Hence, when property is in use, normal assessment techniques will remain an appropriate tool in the appraisal process.

Another suggestion, more appropriate when property is not in use, is the exercise of "more extensive investigation and ingenuity by appraisers in determining and considering factors that affect the value of special purpose properties." J. Eaton, *supra*, at 173. Carlstadt's appraisal expert was candid to recognize that the contamination affected the value of the property. He suggested that the cost to cure the contaminated property could be treated as a capital improvement, which can be depreciated over the beneficial life of the property. Although his approach was not followed by the Tax Court (which found that both expert opinions failed to rebut the presumption of correctness of the municipal assessment), it contains the seeds of useful doctrine.

In reality, industrial property today may be seen as having an encumbered income stream. The owner has to keep the property free of pollution. In assessing property under the income approach, market reality cannot be ignored. As we have noted, the property owner can either pay now or pay later, but its management practices do not dictate what the true value will be. "The appraisal of real property is predicated on the assumption of competent management. This assumption may not be reflected by historical operating statements." *The Appraisal of Real Estate* 356–57 (Am. Inst. of Real Estate Appraisers

ed.) (7th ed.) [hereinafter *The Appraisal of Real Estate*]. Though best seen in the context of competent operating practices relative to the foreseeable obsolescence of income-producing structures, the analogy may be helpful to understand how proper accounting for these costs and care of land should be reflected in evaluating the value of property.

As we have noted, "competent management" by the Scientific Chemical Processing Company might have averted many of today's problems. Those annual expenditures that reflect a reduced net operating income should have correspondingly reduced the appraised value of the property as an income-producer. Today's investment in the cost of neglected cure might prudently be spread out by "competent management" over a number of years. Certainly this would be more realistic than the suggestion of taxpayers' counsel that the full cost of cure be deducted annually from value. (An unexpectedly large legal expense would surely not be an appropriate deduction from value in a single year, but a hypothetical annual expense would not be inappropriate.) True value for assessment purposes is based upon hypothetical conditions and not particular sales conditions. *CPC Int'l, supra,* 193 *N.J.Super.* at 267–68.

We leave to the competence of the appraisal community the sound measure of that adjustment. The Carlstadt property would appear to have had a definable market potential, located as it is in the heart of the Meadowlands sport development area. "Regardless of what procedures are used to develop the economic income projection, the objective is a reasonable estimate of the rent that the property would command, for the foreseeable future, if the space were currently available for rent in the open market." *The Appraisal of Real Estate, supra,* at 328.

While we hesitate to suggest the adaptability of these concepts, related primarily to the obsolescence of structures, to the obsolescence of land use, we have found no ready reference at hand. One suggestion in the parties' briefs that is analogous is

set forth by Patchin, *Valuation of Contaminated Properties*, *The Appraisal Journal* 7 (Jan. 1988) (not reasonable to conclude that contaminated property is unmarketable, but stigma of contamination and other factors suggest that capitalization rate may have to be altered to reflect condition). As noted, we invited *amicus* briefs from a broad perspective, but none has formulated a solution to the problem other than the dollar-for-dollar deduction. Most see the matter solely in terms of the policy choice that we are unable to make in the face of constitutional command.

We are frank to recognize the difficulty of evaluating such market data, but we have recently reaffirmed the unique capability and responsibility of the Tax Court to exercise its power, in circumstances where the presumption of validity of the local assessment does not apply, to use the information available to it to make an independent determination of value. *Transcontinental Pipe Line, supra*, 111 *N.J.* at 538–40 (citing *F.M.C. Stores Co. v. Borough of Morris Plains*, 100 *N.J.* 418, 430–31 (1985); *Pantasote Co. v. City of Passaic*, 100 *N.J.* 408, 416 (1985); *Glen Wall Assocs. v. Wall Township*, 99 *N.J.* 265, 280 (1985)).

■ If an assessor's methodology is patently defective in that it ignores the reality of the effect of these regulatory forces, the Tax Court can properly account for regulatory forces in its determination of market value.

■ In applying these principles to the facts of these cases, we are satisfied that the judgment in the *South Bound Brook* case should stand. Although the Tax Court did not resolve the methodology for assessing the effect of ECRA requirements, it found the data offered an unsatisfactory base for such an adjustment. There was otherwise no apparent flaw in the assessor's methodology. The parties had stipulated the value of the property that was in use as of the assessment date.

■ In the *Carlstadt* case, we find, however, a sufficient challenge to the assessor's methodology to warrant an independent determination of value by the Tax Court. As noted, Carlstadt's appraisal expert recognized that taint affected value, and he valued the property at a figure different from the assessed value, albeit higher. He observed that the cost of cure might best be recognized by amortizing the cost: "if you look at the recovery of the land as a capital improvement, then certainly you would write it off over a much longer period of time."

The judgment of the Appellate Division is affirmed in *GAF Corporation v. Borough of South Bound Brook*. The judgment of the Appellate Division is reversed in *Inmar Associates, Inc. v. Borough of Carlstadt* and the matter remanded to the Tax Court for further proceedings in accordance with this opinion.

*For Affirmance in No. A–76 and Reversal in No. A–77.*

Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, GARIBALDI and STEIN—7.

*For Reversal in No. A–76*—None.

*For Affirmance in No. A–77*—None.