[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff appealed to the Board of Tax Review from the tax assessment upon certain of its real property in the City of Norwich for the tax year 1988. When the Board refused to reduce the assessment, the plaintiff appealed to this Court pursuant to General Statutes Section 12-118. By amended complaint filed April 11, 1991, the appeal was expanded to include the assessments for the tax years of 1989 and 1990.
I.
The city's tax assessor estimated the true and actual value of the plaintiff's property to be: land, $98,629; building, $937,042; total $1,035,671. As the property is liable for taxation at 70 percent of the true and actual value, the assessment was: land, $69,040; building, $655,930; CT Page 9532 for a total assessment of $724,970.
The plaintiff's appraiser, Robert J. Flanagan, whose qualifications were stipulated to by the defendant, first inspected and appraised the property on June 8, 1989, and again on May 10, 1990, in the light of the testimony of plaintiff's other expert witness, Mark Temple, a hydrogeologist. The plaintiff's property comprises 2.79 acres located on the west bank of the Thames River, in an I-2 zone (heavy industrial), with 315 feet of frontage on the river, and 350 feet of frontage on the Central Vermont Railway track. There are four buildings which total 34,866 square feet, including an office, warehouse, garage and a concrete block building used for storage. The property is occupied by two tenants, and the plaintiff, which operates a fuel oil distribution business at the site.
Flanagan considered the three commonly recognized appraisal methods: income, cost and sales comparison approaches. He rejected the cost approach because of the age and accrued depreciation of the buildings and considered the other two.
In doing so, he arrived at $802,000 using the sales comparison approach. As the plaintiff owner possesses, uses and occupies a major portion of the premises, Flanagan used a "market rent" concept combined with the actual rental paid by the tenants and by the use of the income approach, capitalized the estimated value to be $791,000. Flanagan gave less weight to the sales comparison method and concluded that the plaintiff's property had a value of $791,000.
It was the appraiser's opinion that the highest and best use of the property is its existing current "industrial/office" use.
The plaintiff's hydrogeologist, Mark Temple of Lenard Engineering, inspected the property and performed an environmental evaluation, which included a review of Connecticut Department of Environmental Protection (DEP) records and files concerning the subject premises and the surrounding properties and the plaintiff's own files. Significantly, Temple recommended to the plaintiff that a subsurface investigation be performed consisting of soil borings and the installation of groundwater monitoring wells in order to effectively evaluate "the potential liability associated with on site contamination;" (Plaintiff's Exhibit B); however, this was not done. Temple opined that two abutting properties ("the Malchman site" and the "Desio site") introduced some "PCBs" and other contaminants into the subject CT Page 9533 property, as they were the subject of DEP orders. He also determined that prior to title to the premises being obtained by plaintiff's "related"[1] predecessors in title, the property was contaminated with "heavy metals" as a result of its use as a foundry by International Silver Co., and that it was further contaminated by the plaintiff's own fuel oil spill/leak which was discovered in 1979. A PCB remedial cleanup was conducted by one of the abutters, and an oil recovery program was effected by the plaintiff prior to Temple's evaluation, and it was not clear how successful these cleanup efforts were.
The essence of Temple's testimony is that the plaintiff's property is contaminated by pollutants and hazardous waste, some of which emanated from abutters, and some of which from operations conducted by the plaintiff and its related and unrelated predecessors in title. Temple did not quantify or allocate the contribution of contaminants among these emanators. There are no outstanding orders from the DEP or any other environmental agency directed to the plaintiff or any of its predecessors in title to remove any contaminants that may exist.
It was Temple's estimate that the cost of removal and clean up of the contamination fell into two categories, the first, the fuel oil removal and the cost of the subsurface investigation and the second, the removal of the soils contaminated by pollutants and hazardous wastes. He further estimated a cost for the clean up of the first category of $205,000, and for the second category, somewhere between a low of $250,000 to a high of $1,000,000, and estimated a total cost for both categories of $775,000. He based these estimates on "known and unknown" site conditions.
The plaintiff has not embarked upon such a clean up program, nor has it entered into a contract with anyone to do so.
Flanagan testified that a willing buyer's knowledge of contamination would have a substantial adverse effect on what such a buyer would be willing to pay for the property, and hence, its fair market value could be greatly depreciated.
Flanagan reasoned that the $775,000 estimated cost of cleanup should be subtracted from his preferred valuation of $791,000 to arrive at a net fair market value of $16,000, but also conceded that if the cleanup cost was amortized over a five-year period, then his opinion of value of the property would be revised to $203,000.
Although the defendant's assessor was present CT Page 9534 throughout the trial, he did not testify, and the defendant city rested without producing any evidence.
II.
General Statutes Section 12-111 states in pertinent part that any person claiming to be aggrieved by the doings of the assessors of such town may appeal therefrom to such board of tax review, which shall determine all such appeals and report in writing the final determination of such appeals to each such person within one week after such determination has been made.
Any person "claiming to be aggrieved by the action of the board of tax review in any town or city may, within two months from the time of such action, make application, in the nature of an appeal therefrom, to the superior court for the judicial district in which such town or city is situated. . . ." General Statutes Section 12-118.
If the plaintiff alleges in its complaint that it is the owner of the subject property, was properly before the board of tax review and received an adverse decision from the board, and is aggrieved by the board's action, plaintiff may properly appeal to the superior court under Section 12-118. Lerner Shops of Connecticut, Inc. v. Waterbury, 151 Conn. 79,83, 193 A.2d 472 (1963).
Plaintiff has asserted that it is the record owner of the subject property, that it was properly before the Norwich Board of Tax Review, and that it received an adverse decision from the Board.
In Gorin's, Inc. v. Board of Tax Review, 178 Conn. 606,608 (1979), the court stated that:
 (i)n an appeal . . . from a board of tax review, the court performs a double function. The court must first determine whether the plaintiff has met his burden of establishing that he is, in fact, aggrieved by the action of the board. Only when the court finds that the action of the board will result in the payment of an unjust and, therefore, illegal tax, can the court proceed to exercise its broad discretionary power to grant such relief as is appropriate. (Citations omitted). The burden, in the first instance, is upon the plaintiff to show that he has, in fact, been aggrieved by the action of the board in that his property has been CT Page 9535 overassessed. (Citations omitted).
In Stamford Apartments Co. v. Stamford, 203 Conn. 586,589 (1987), the court stated that:
 (w)hen a property owner challenges the assessor's valuation, the plaintiff's burden is a difficult one. Proper deference must be given to the judgment and experience of assessors. (Citations omitted.) (Emphasis in original.) The law contemplates that a wide discretion is to be accorded to assessors, and unless their action is discriminatory or so unreasonable that property is substantially overvalued and thus injustice and illegality result, their opinion and judgment should control in the determination of value for taxation purposes. (Citations omitted). While we have recognized that proper deference should be accorded to the assessor's valuation, we have never characterized such deference as a presumption in favor of the validity of the assessment which it is the plaintiff's burden to rebut.
In Stamford Apartments, supra, the court found that no deference to the assessor's valuation was warranted as neither the assessor nor the appraiser who valued the property for the list in dispute testified at trial, and further that a town appraiser who did testify at trial stated that the appraisal method used by the town was inappropriate. Stamford Apartments, supra, 589-90.
Plaintiff argues that the assessor's valuation of its property is excessive and unfair. Plaintiff also argues that this allegedly unfair valuation is made even more unfair because the assessor refused to give plaintiff a lower valuation due to the pollutants on the property. Plaintiff argues that the true and proper valuation of the property is a lower value than that given by the assessor, and should be further reduced by the amount of cleaning costs.
Plaintiff introduced extensive testimony and evidence as to valuation of the subject property. Flanagan, stipulated by the parties to be an expert appraiser, testified that the subject property had a value of $791,000 if no allowance is given for the pollution. Flanagan also prepared an extensive and detailed report with photographs and other CT Page 9536 data containing his appraisal of the subject property, which was placed into evidence without objection. (Plaintiff's Exhibit 8.)
The Court concludes that no deference should be shown towards the tax assessor's evaluation in this particular case for two reasons: first, the property is used for a specialized purpose and there are no sufficiently similar properties with which to compare it; and second, defendant's failure to introduce any evidence or testimony at trial in defense of how it arrived at its valuation for a property with complex factors. The Court further concludes that plaintiff has met its burden of proof to show that its property has been overassessed, and that therefore, finds that the plaintiff is aggrieved. Gorin's, Inc. v. Board of Tax Review, 178 Conn. 606,608 (1979). The Court bases its conclusion on Flanagan's testimony that the property had a value of $791,000. Comparing this value to the assessor's valuation of $1,035,671, the difference is a substantial overvaluation.
III.
"A taxpayer who is aggrieved by the decision of the board of tax review has an appeal to the courts where the matter is tried de novo." Hutensky v. Avon, 163 Conn. 433,436, 311 A.2d 92 (1972) (citations omitted). "An appeal from a decision of a board of tax review invokes the equitable powers of the court. . . ." Hutensky, supra. "The court is not limited to a review of whether an assessor's action has been unreasonable or discriminatory or has resulted in substantial overvaluation. Mere overvaluation is enough to justify redress under Section 12-118." Id. (citations omitted.) "In the appeal to the court, the ultimate question is the ascertainment of the true and actual value of the plaintiff's property." Id., 436-437. (citations omitted); see also Dickau v. Glastonbury156 Conn. 437, 444, 242 A.2d 777 (1968).
IV.
In 1939, title to the subject property passed from The Sagamore Realty Company to Jacob R. Slosberg. Thomas Castle, the Chief Operation Officer of plaintiff, testified at the trial de novo, first, that Jacob Slosberg was his grandfather, and second, that ownership of the subject property has remained in his family for many years, with changes in the legal structure and names of the property owners for tax purposes.
Plaintiff argues that although its predecessors in title might have some familial relationship with officers of CT Page 9537 the plaintiff, this is not a valid reason to impute the responsibility of pollution of the site to plaintiff. The plaintiff further claims that it cannot be held responsible for pollution or contamination visited upon the site by prior owners, whether related to the plaintiff or unrelated.
All of the deeds of title placed into evidence after the deed from Humble Oil Refining Company to Castle 
Company in 1970 (Plaintiff's Exhibit K), indicate that the transfers were intra-family or intra-organization; and with the exception of a minimal conveyance tax collected on one deed, there were no conveyance taxes collected with respect to any of the transfers. The deeds therefore indicate that there was no bona fide sale of the premises from 1979 (when the fuel oil spill occurred) to the present time. The plaintiff has failed to sustain its burden of proving that it is not substantially the same entity which owned the premises at the time of the fuel oil spill in 1979. Whatever may be the effects of pollution caused either by plaintiff's nonrelated predecessors in title or offsite abutters is unnecessary to determine for the reasons hereafter stated.
V.
Plaintiff claims that the valuation of the subject property should be reduced to reflect the estimated cost of cleaning up the pollution on the property. Plaintiff has submitted an environmental property evaluation, which suggests that the cost of cleanup may be anywhere between $455,000 to $1,205,000, and may well exceed $775,000.
Defendant argues that the subject property is not entitled to any reduction in valuation because of pollution. Defendant argues that property burdened with cleanup expenses is analogous to property burdened by a mortgage, and is a cost of doing business and that neither warrants a reduction in the value of the land.
The parties have not cited, and research has not revealed, any Connecticut cases or statutes which address the issue of the impact of pollution on property valuation prior to the enactment of General Statutes Section 12-63e (effective June 8, 1990). The Court may look to other jurisdictions for guidance as to whether tax assessments of real estate may be reduced because of the effects of such pollution.
Inmar Associates v. Borough of Carlstadt; GAF Corporation v. Borough of South Bound Brook, 112 N.J. 593,549 A.2d 38 (1988), involved appeals by two corporations which owned polluted real property. At issue was the proper method CT Page 9538 for determining the assessed value of real property subject to governmentally-imposed requirements for environmental cleanup. Although the plaintiff's property in the case under consideration is not currently under any government cleanup orders, either federal or state, Inmar's discussion of factors to be considered in making assessments is illuminating.
The first Inmar plaintiff operated an industrial solvent recovery operation. At the time of the assessment in issue in that case, the site had been abandoned by the user and had been placed on the federal Superfund list. No cleanup had taken place at the time of the assessment, nor had any firm or fixed obligation to do restoration work been incurred. Inmar argued that its property was unmarketable and should therefore be regarded as having no value. Inmar argued in the alternative that the costs of cleanup should be deducted from the value of the property.
The second Inmar plaintiff, GAF, operated an asphalt siding plant. At the time of the assessment in issue in that case, the property was being used for that purpose. GAF stipulated that absent chemical contamination, its property in dispute would be worth $1,600,000. It argued that the costs to clean up the property in accordance with governmentally-imposed requirements should be considered when assessing the land.
The court in Inmar, in determining whether pollution should be considered in establishing a property's assessment value, set out the following hypothetical. Assume a company operates
 with extremely high standards of industrial cleanliness. That company perhaps would have incurred increased costs for its increased attention to the environmental maintenance of its property. In 1982, if the company had chosen to sell its clean plant site for a bank or a hotel . . ., the present value of the property would be great but at the sacrifice of the landowner's profits from cleanup incurred over the years.
 The bottom line would be the same for the company that deferred its property maintenance until it sought to sell the land. In either case, the cost must be incurred either as you go or before you sell. In neither case would the price that a willing buyer would pay to the willing CT Page 9539 seller be different. The true value or the market value would be the same.
Inmar, supra, 601-02. The court went on to state that "(s)imply because cleanup costs will affect the owner's profits does not automatically require a reduction in tax assessment." Id., 605. "(T)he property owner can either pay now or pay later, but its management practices do not dictate what the true value will be. The appraisal of real property is predicated on the assumption of competent management." Id., 607 (citations omitted).
The Inmar court considered various analogies and examples of factors having downward effects on value, and discussed how forces such as environmental pollution, depreciation, regulations and regulatory agency orders should be viewed as market factors. The Inmar court went on to say, at pages 603-604, "But when the governmental restraints are temporary or subject to cure, the transitory absence of a market does not eliminate value. (citation omitted.) (Value depends on whether restrictions on use can reasonably be removed "in the forseeable future") . . . One thing is certain: the methodology for resolving the question is not simply to deduct the cost of the cleanup from a putative value of the property. (emphasis provided.) That would reflect only the cost accounting practices of the current owners . . . simply because cleanup costs will affect the owner's profits does not, however, automatically require a reduction in the tax assessment. An owner's expenditures of cost are "never conclusive on the question of value for tax purposes."
The plaintiff's factual situation is similar to that of the second plaintiff, GAF in Inmar, as they both own and operate a `special use' type property. However, the suggestion that the cost of curing pollution be recognized by writing it off in Inmar over a much longer period of time does not help the plaintiff, and its reliance on that case is misplaced. It is not possible on the state of the record to decide what effect, if any, the pollution present on the plaintiff's land has on the valuation.
The evidence of Temple as to the extent of the pollution was at most an educated guess. It was not founded on a subsurface investigation of test borings or monitored wells recommended by him to determine how deep the pollutants pervaded, or whether, in fact, any of the contamination was still there. Nor was Temple able to quantify sufficiently what portion of the cost of cleanup was allocable to that caused by offsite polluters, and by plaintiff's related and unrelated predecessors in title. Moreover, the ranges in the CT Page 9540 cost estimates were so wide (for the contaminated and hazardous waste soil removal), from $455,000 to $1,205,000, as to cast grave doubt on his estimate of $775,000 and make it unpersuasive. Even if the Court were to credit Temple's testimony as to a portion of the cost of the cleanup, the Court is unable to credit Flanagan's alternative methods of deducting the pollution factor from the income approach value he derived of $791,000. In the first alternative, he deducted the entire cleanup estimate of $775,000, leaving a net value of $16,000; in the second, he amortized the cleanup estimate over five years for a net value of $203,000.
When the Court considers that the property is in full use, and has a specialized use, and as testified to by Flanagan, would be very difficult to build anywhere in the State of Connecticut because of the need for licensing, the effect of environmental laws and the like, and is a "rare commodity," the Court rejects this portion of Flanagan's opinion. "The trial court can accept or reject the testimony of expert witnesses offered by one party or the other, in whole or in part. Midway Green Corporation v. Board of Tax Review, 8 Conn. App. 440, 443 (1986). The plaintiff has not met its burden of proof as to the diminution of value of the property as a result of the pollution and its cleanup costs.
VI.
As the plaintiff amended its complaint to include the assessment on the October 1, 1990 list, the Court called the parties' attention to General Statutes Section 12-63e, which became effective June 8, 1990, and asked the parties for briefs on its application to the case.
Section 12-63e provides:
 Notwithstanding the provisions of this chapter, when determining the value of any property, except residential property, for purpose of the assessment for property taxes, the assessors of a municipality shall not reduce the value of any property due to any polluted or environmentally hazardous condition existing on such property if such condition was caused by the owner of such property or if a successor in title to such owner acquired such property after any notice of the existence of any such condition was filed on the land records in the town where the property is located. CT Page 9541 For purposes of this section, an owner shall be deemed to have caused the polluted or environmentally hazardous condition if the department of environmental protection, the United States Environmental Protection Agency or a court of competent jurisdiction has determined that such owner caused such condition or a portion of it.
As this Court is one of competent jurisdiction, it concludes from the testimony of the plaintiff's president and Temple that the plaintiff's related predecessor in title, Castle Company, caused a portion of the pollution on the site. Having so determined, the Court further concludes that the plaintiff may not escape the consequences of the pollution caused by its related predecessors in title by the intra-family and intra-organization transactions previously described. Therefore, any reduction in valuation attributed to pollution on the list of October 1, 1990 is prohibited by Section 12-63e.
The Court now must turn to the ultimate question: the ascertaining of the true and actual value of the plaintiff's property. In doing so, the Court has considered the testimony and report of the appraiser, the photographs in the appraiser's report and its own general knowledge of the elements of value. The Court finds that the true and actual value of the plaintiff's property is that set forth by Flanagan, under the income approach: land, $112,000; improvements, $679,000; total, $791,000. The assessed value shall be 70 percent thereof.
Therefore, the plaintiff's appeal is sustained and judgment may enter for the plaintiff that the defendant Board of Tax Review reduce the assessed valuations on the lists of October 1, 1988, 1989 and 1990 accordingly, and refund or credit any excess taxes which may have been paid.
Costs are taxed in favor of the plaintiff.
Teller, J.