OSTERLUND, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Osterlund, Inc. v. Commissioner
Docket No. 35570-83.
United States Tax Court
T.C. Memo 1987-40; 1987 Tax Ct. Memo LEXIS 40; 52 T.C.M. (CCH) 1451; T.C.M. (RIA) 87040; January 20, 1987. *40 Petitioner-corporation leased vacant land from a related partnership pursuant to a month-to-month lease. The partnership had purchased the land solely for petitioner's use. At the time of the purchase, it was anticipated that the land would be developed and ready for petitioner's use within 1 year. Petitioner made payments to the partnership pursuant to the month-to-month lease even though unforeseen, adverse economic conditions made it impracticable to develop the land until after the years in question. Held, petitioner's payments to the partnership were rental payments that were required to be made as a condition to the continued use or possession of the land for purposes of petitioner's trade or business, and the payments therefore constitute deductible rentals within the meaning of sec. 162(a)(3), I.R.C. 1954. Gerald T. Sajer and Charles H. Stone, for the petitioner. J. Leon Peace, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Chief Judge: By notice of deficiency dated September 29, 1983, respondent determined deficiencies in petitioner's Federal income taxes for the fiscal years ended September 30, 1979, September 30, 1980, and September 3, 1981, in the following amounts: FY ended
Sept. 30,
Deficiency
1979
$16,255 1980
77,280
1981
77,085
After concessions, the only issue for decision in this case is whether certain payments by petitioner were rental payments deductible under section 162(a)(3). [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. *42 The stipulated facts and exhibits attached thereto are incorporated herein by this reference. Osterlund, Inc. (hereinafter petitioner), is a Pennsylvania corporation. At the time the petition was filed in this case, its principal place of business was in Harrisburg, Pennsylvania. Petitioner filed its Federal income tax returns for the years in question with the Office of the Internal Revenue Service in Philadelphia, Pennsylvania. In 1977, petitioner began manufacturing heavy duty trucks. Its place of business was too small for its manufacturing operations, however, causing petitioner to look for a piece of property on which it could build a larger manufacturing plant. Petitioner located a suitable vacant tract of land, consisting of approximately 48 acres, in a Harrisburg industrial park. This property (hereinafter the Property) was available for purchase only as a 48-acre tract of land. Petitioner was unable to borrow the money necessary to purchase the Property and construct the manufacturing plant. At the same time, petitioner wanted to insulate the Property and the manufacturing plant to be constructed thereon from its potential judgment creditors. Consequently, petitioner *43 decided that a partnership known as Lojan Associates (hereinafter Jojan) would acquire the Property, construct a facility thereon suitable for petitioner's manufacturing operations, and lease the Property and the manufacturing facility to petitioner. The partners of Lojan were Loyal F. Osterlund (hereinafter Loyal), the president of petitioner and owner of 60 percent of petitioner's stock, and Jan Osterlund, Loyal's son and owner of 1 percent of petitioner's stock. Loyal negotiated the purchase of the Property on behalf of Lojan with Robert Mumma (hereinafter Mumma), the president and owner of Bobali Corporation (hereinafter Bobali), the owner of the Property. Mumma offered to sell the Property to Lojan for $20,000 an acre. Loyal believed, based on his knowledge of other sales of property in the industrial park where the Property was located, that the fair market value of the Property was approximately $20,000 an acre. Loyal also believed, however, that Mumma was experiencing serious financial difficulties. Consequently, Loyal offered to purchase the Property for approximately $10,000 an acre. Mumma accepted this offer on the condition that Loyal agree to convey a designated 9-acre *44 portion of the Property to Mumma or Mumma's son, Robert Mumma II, if Mumma should so request, for a price equal to $10,000 an acre plus interest. Loyal orally agreed to this condition, and on July 13, 1979, Lojan purchased the Property from Bobali for $476,737. On the same date, Lojan and petitioner entered into a lease dated July 13, 1979, whereby Lojan leased the Property to petitioner on a month-to-month basis for $14,000 per month. Loyal set the rent at $14,000 per month because he believed that the fair market value of the Property was approximately $1,000,000, and that a lessor of property similar to the Property would require a return on his investment of 16.5 or 17 percent upon leasing such property in an arm's-length transaction. In order to finance its purchase of the Property, Lojan borrowed $450,000 at a floating interest rate. To secure this loan, Lojan gave the lender a demand note and a mortgage on the Property, assigned the lease between Lojan and petitioner to the lender, and pledged 5,000 shares of Western Union common stock. The interest rate on the loan began at 12 percent in July of 1979, was at 16 percent in December of 1979, went as high as 20 percent in *45 April of 1980, and was over 19 percent for most of 1981. The yields on long-term United States Government bonds were 9.33 percent in 1979, 11.39 percent in 1980, and 13.72 percent in 1981. In addition to making the mortgage payments on the Property, Lojan paid all taxes and insurance with respect to the Property for the years in question. Shortly after the purchase of the Property, Lojan began designing petitioner's new manufacturing facility and looking for a contractor to build it. It was anticipated that the new facility would be fully constructed and ready for petitioner's use within a year after the purchase of the Property. However, due to high and increasing interest rates and a decreasing demand for petitioner's trucks, Lojan and petitioner decided to delay construction of the facility. As a result, construction of the facility did not begin until 1983, and the facility was not completed and occupied by petitioner until late 1984. In late 1981, Lojan conveyed 9 acres of the Property to Mumma for $10,000 an acre, plus interest from the date Lojan purchased the Property. This conveyance was made pursuant to the oral agreement between Loyal and Mumma referred to above. *46 In 1983, Lojan sold 7.5 acres of the Property to an unidentified purchaser for $42,000 an acre. During the years in question, petitioner paid Lojan the following amounts pursuant to the lease dated July 13, 1979: FY ended
Sept. 30,
Lease Payment
1979
$28,000
1980
168,000
1981
168,000
Petitioner deducted these amounts on its corresponding Federal income tax returns and respondent disallowed the deductions. OPINION The issue for decision in this case is whether petitioner's payments to Lojan during the years in question, pursuant to the lease dated July 13, 1979, were rental payments deductible under section 162(a)(3). Petitioner bears the burden of proof with respect to this issue. Rule 142(a); Welch v. Helvering,290 U.S. 111, 115 (1933). Section 162(a)(3) allows as a deduction all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including "rentals or other payments required to be *47 made as a condition to the continued use or possession, for purposes of the trade or business, of property * * *." In determining whether the payments here in issue were rental payments deductible under this section, the "basic question is * * * whether they were in fact rent instead of something else paid under the guise of rent." Place v. Commissioner,17 T.C. 199, 203 (1951), affd. per curiam 199 F.2d 373 (6th Cir. 1952). Such an inquiry in a situation involving a lease of property between related parties "requires a careful examination of the circumstances surrounding the rental of the property to determine the intentions of the parties in agreeing upon [the] lease and in fixing the terms thereof." Davis v. Commissioner,26 T.C. 49, 56 (1956). The question whether payments are rental payments within the meaning of the statute is a question of fact to be resolved on the basis of all the facts and circumstances of the case. Thomas v. Commissioner,31 T.C. 1009, 1012 (1959); Southern Ford Tractor Corp. v. Commissioner,29 T.C. 833, 842 (1958). Respondent takes the position that the payments *48 here in issue were not rent but were dividends disguised as rent.He bases this position on his assertion that petitioner did not have a valid business purpose for leasing the Property from Lojan during the years in question, arguing that (1) petitioner did not have a projected use for the entire 48 acres of the Property, and (2) "[p]etitioner did not have any need or use for [the Property] while it was unimproved * * * [and] [n]o party dealing at arm's length would lease unimproved real estate [that it could not use] on a month-to-month basis from a lessor who orally promised to build a facility for it if and when it could obtain financing to construct the improvement at some unknown future date where there is no binding obligation to make such improvements." In the alternative, respondent argues that the payments were in excess of the fair rental value of the Property, and that the payments were not, therefore, required to be made as a condition to the continued use or possession of the Property. [2]
*49 Petitioner contends that the payments were rentals that it was required to pay as a condition to the continued use or possession of the Property for purposes of its trade or business. Petitioner argues that it leased the Property from Lojan for a valid business purpose, namely, to satisfy its immediate and future need for more space, and that the payments to Lojan were not greater than the fair rental value of the Property. For the reasons set forth below, we find for petitioner. On the record before us, we believe petitioner had a valid business purpose for leasing the Property from Lojan, namely, to satisfy its immediate and future need for more space. The record establishes that petitioner needed more land to expand its manufacturing operations. Petitioner located a suitable piece of property (the Property) and decided, for legitimate business reasons, that a separate but related entity would purchase the Property for petitioner's use. That entity, Lojan, purchased the Property solely for petitioner's use and incurred a substantial amount of indebtedness at a high and increasing interest rate to finance the purchase. It was anticipated that the Property would be developed *50 and used by petitioner in the year following the Property's purchase. The only reason the Property was not developed and used by petitioner as planned was because unforeseen, adverse economic conditions made such development impracticable. To argue, on these facts, that petitioner did not have a valid business purpose for making the payments to Lojan is, in our view, untenable. By virtue of making the payments to Lojan, which were required to be made for the continued use or possession of the Property by a written document that in all respects resembled a lease, petitioner "possessed" the Property for the valid business purpose of ensuring that it would have the Property for its use when more favorable economic conditions permitted such use. [3]
The fact that unrelated parties probably would not have adopted the precise form of the transaction between Lojan and petitioner does not mean that petitioner did not lease the Property for a valid business purpose. The lease was intended to be of short duration and an interim measure until the Property could be developed, and no purpose would have *51 been served if the parties had entered into a longer term lease while the Property remained undeveloped. Moreover, because the parties were closely related, they did not need the same protections and safeguards that unrelated parties would have required in a similar transaction. Certainly, the form of a transaction involving a lease between related parties is a fact or circumstance surrounding the lease to be considered in determining the true character of the payments made pursuant to the lease. However, after considering all the facts and circumstances surrounding the lease in this case, we are convinced that the payments made to Lojan as rent were intended by the parties to compensate Lojan for petitioner's possession of the Property, and that the Property was possessed by petitioner for purposes of its trade or business, namely, to hold the Property until economic conditions permitted the development of the Property for its use. Respondent also argues that petitioner did not have a valid business purpose for leasing the Property because petitioner did not have a projected use for the *52 entire 48 acres of the Property. Assuming, without deciding, that petitioner leased more land from Lojan than it needed to expand its manufacturing operations, we note that the Property was available only as a 48-acre tract of land. Consequently, in order for petitioner to obtain the land it needed to expand its business operations, Lojan had to purchase the entire 48 acres of the Property. Since Lojan acquired the Property solely for petitioner's use and incurred a substantial amount of indebtedness to finance the purchase, and since it is unlikely that Lojan would have purchased the Property if it could not have counted on petitioner to lease the entire 48 acres, we conclude, on these facts, that petitioner had a valid business purpose for leasing all of the Property from Lojan. Respondent's final contention is that the payments in issue were in excess of the fair rental value of the Property for the years in question, and that the payments therefore were not required to be made as a condition to the continued use or possession of the Property. Section 162(a)(3) does not expressly limit *53 deductions for rental expenses to a reasonable amount. However, [w]hen there is a close relationship between lessor and lessee and in addition there is no arm's length dealing between them, an inquiry into what constitutes reasonable rental is necessary to determine whether the sum paid is in excess of what the lessee would have been required to pay had he dealt at arm's length with a stranger. * * * [Place v. Commissioner,17 T.C. at 203.] Three experts, two presented by petitioner and one by respondent, expressed their opinions at trial as to the fair rental value of the Property during the years in question. Respondent's expert, Charles H. Rapp, Jr. (Rapp), testified that the fair rental value of the Property was $4,200 per month. Petitioner's expert, Lester G. Connor (Connor), testified that the net fair rental value of the Property, that is, the fair rental value of the Property exclusive of amounts for taxes and insurance, was $12,800 per month. Petitioner's other expert, William J. Daylor (Daylor), testified that the fair rental value of the Property, including amounts for taxes and insurance, was $14,200 per month. All three of these experts *54 used essentially the same method to derive their estimates of the Property's fair rental value. They first estimated the Property's fair market value using comparable sales of property. They then multiplied their estimates of the Property's fair market value by a rate of return they believed a lessor of property similar to the Property would have required during the years in question upon leasing such property in an arm's-length transaction. We agree with the parties that this is a reasonable method for determining the fair rental value of the Property. [4]
Connor estimated that the fair market value of the Property on the date Lojan purchased it was $20,000 an acre or $960,000 in total. He based this estimate on a review of the sales of 12 properties in the Harrisburg area from 1973 through 1984 that he considered to be comparable to the Property. Connor also concluded that the fair market value of the Property remained at $960,000 during the years in question "due to the high interest rates which caused declining economic conditions which offset inflationary increases." Connor was aware *55 that Lojan had purchased the Property for approximately $10,000 an acre, but he did not rely on this fact in determining the fair market value of the Property because he believed that Lojan's purchase of the Property was not at fair market value. Connor estimated that a lessor of property similar to the Property would have required a return on his investment during the years in question of 16 percent upon leasing such property in an arm's-length transaction. He calculated this rate by first determining a "safe" or "non-risk" rate for the years in question, which he concluded was 11.5 percent, and he added to this rate 1.5 percent for lack of safety, 2 percent for lack of liquidity, and 1 percent for the burden of management. The 11.5-percent "safe" rate was an average of the yields on long-term United States Government bonds for the years in question. The product of $960,000 and 16 percent is $153,600, or $12,800 per month, and Connor concluded that these amounts represented the fair rental value of the Property for the years in question, exclusive of amounts for taxes and insurance. Daylor used two methods to derive his estimate of the Property's fair rental value. Daylor estimated *56 the Property's fair market value for the years in question using comparable sales. He then multiplied this value by a rate of return he believed a lessor of property similar to the Property would have required during the years in question upon leasing such property in an arm's-length transaction. Using this method, Daylor concluded that the fair rental value of the Property, including amounts for taxes and insurance, was $14,050 per month. [5] Daylor also derived a fair rental value of the Property using two leases of unimproved properties in the Harrisburg area. According to Daylor, these leases indicated that the Property had a fair rental value of $14,813 per month. Daylor finally concluded, after considering the value indicated by the leases and the value indicated by applying his rate of return to his estimated fair market value of the Property, that his best estimate of the Property's fair rental value for the years in question was $14,200 per month. Daylor agreed with Connor that the fair market value of the Property did not change during the years in question, and that the sale of the Property from Bobali to Lojan was not at fair market value. *57 Rapp estimated that the fair market value of the Property was $10,000 an acre, or $480,000. He based this estimate on a single sale of approximately 10 acres of unimproved land on July 13, 1979, from Bobali Corporation to Robert Mumma II for $10,000 an acre. Rapp then determined that the yield on BAA rated corporate bonds in September of 1979 was 10.5 percent, and he concluded, after multiplying $480,000 by 10.5 percent, that the fair rental value of the Property for the years in question was $4,200 per month. After considering the testimony and reports of the experts, and all the other evidence in the record, we conclude that the fair rental value of the Property for the years in question, including amounts for taxes and insurance, was not less than $14,000 per month. We find the opinions expressed by petitioner's experts to be particularly credible. Not only were petitioner's experts extremely well qualified, but both experts had appraised property in the Harrisburg area for many years. We also were impressed with the comprehensiveness of their reports. In contrast, we found the opinion expressed by respondent's expert not to be credible. Respondent's expert offered no *58 explanation why a lessor of property similar to the Property would have required a rate of return on his investment equal to the rate of return on a BAA rated corporate bond. Moreover, in view of the fact that Lojan was paying 16 percent on its loan to purchase the Property in December of 1979, 20 percent in April of 1980, and more than 19 percent for most of 1981, and that long-term United States Government bonds were paying 11.39 percent in 1980 and 13.72 percent in 1981, we cannot accept the contention that a lessor of property similar to the Property would have required a return on his investment during the years in question of only 10.5 percent upon leasing such property in an arm's-length transaction. We also note that respondent's expert based his estimate of the fair market value of the Property on a single sale of property from Bobali Corporation to Robert Mumma II, the son of the owner of Bobali Corporation, and that he made no effort to determine whether this sale was an arm's-length transaction. On the record before us, we conclude that petitioner's payments to Lojan during the years in question, pursuant to the lease dated July 13, 1979, were in fact rentals required *59 to be paid for the continued use or possession of the Property for purposes of petitioner's trade or business. It follows that the payments are deductible under section 162(a)(3). Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all sections referred to are sections of the Internal Revenue Code of 1954, as amended and in effect during the years in question, and all rules referred to are rules of the Tax Court Rules of Practice and Procedure.↩
2. Respondent also makes the curious argument that, under the rule articulated in Commissioner v. Danielson,378 F.2d 771 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965), "[p]etitioner cannot vary the clear and unambiguous terms of the [lease between petitioner and Lojan] by oral testimony." This case is appealable to the Court of Appeals for the Third Circuit, and we are therefore bound by the law of that circuit in this case. See Golsen v. Commissioner,54 T.C. 742, 756-757 (1970), affd. 445 F.2d 985 (10th Cir. 1971). However, respondent's reliance on Danielson in this case is misplaced because, as the Third Circuit expressly noted therein, Danielson did not involve "a situation where the Commissioner [was] attacking the transaction in the form selected by the parties * * *." 378 F.2d at 774. In this case, unlike the situation in Danielson, respondent is attacking the form of the transaction selected by the parties, arguing that the payments in question were dividends and not rental payments, even though the lease between Lojan and petitioner expressly denominated the payments as rent. "Where the Commissioner attacks the formal agreement the Court involved is required to examine the 'substance' and not merely the 'form' of the transaction." Commissioner v. Danielson,supra↩ at 774. Accordingly, we must consider all the evidence in the record, including petitioner's oral testimony, to determine the substance of the transaction between Lojan and petitioner, and we are not limited, as respondent suggests, to the four corners of the printed lease.
3. See Flambeau Plastics Corp. v. Commissioner,T.C. Memo. 1963-29↩.
4. See Clairton Slag, Inc. v. Commissioner,T.C. Memo. 1979-485↩.
5. Daylor estimated that the fair market value of the Property for the years in question was $1,080,000, and that a fair rate of return during those years for a lessor of property similar to the Property was 15 percent. The product of these numbers is $162,000, and, after adding $6,100 for real estate taxes and $500 for insurance, Daylor concluded that the fair rental value of the Property, including amounts for taxes and insurance, was $14,050 per month.↩