T.C. Memo. 2002-65


UNITED STATES TAX COURT


HUNT & SONS, INC., Petitioner <u>v</u>. COMMISSIONER OF
INTERNAL REVENUE, Respondent


Docket No. 5127-00.                    Filed March 8, 2002.


<u>Michael P. Casterton</u>, for petitioner.

<u>Christian A. Speck</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


BEGHE, <u>Judge</u>:  On March 10, 2000, respondent issued a notice
of deficiency determining the following deficiencies and
penalties with respect to petitioner's Federal income taxes:

| TYE Dec. 31 | Deficiency | Accuracy-Related Penalty Sec. 6662(a) |
|---|---|---|
| 1996 | $278,640 | $16,173.60 |
| 1997 | 357,963 | 17,087.00 |

After concessions by the parties, the only issues remaining for determination are: (1) Whether petitioner overstated certain rental expense deductions on six properties, and (2) whether petitioner is liable for accuracy-related penalties under section 6662(a)[1] for overstating rental expense deductions on these properties.

We hold that petitioner deducted rent in excess of the fair market rental value for two of the six properties of $30,300 for 1996 and $35,900 for 1997, and we therefore disallow $66,200 in deductions. We further hold that petitioner is not liable for accuracy-related penalties under section 6662(a).

FINDINGS OF FACT

Most of the facts have been stipulated and are so found. The stipulation of facts and the related exhibits are incorporated by this reference.

When petitioner filed its petition in this case, its principal place of business was in Sacramento, California. Petitioner is a supplier of petroleum products and equipment and

[1]Unless otherwise indicated, section references are to the Internal Revenue Code applicable to the tax years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

an operator of commercial cardlocks. A commercial cardlock is an unstaffed self-service gas station for commercial vehicles. To accommodate large trucks, cardlocks are usually built on larger parcels (on the order of 1-1/2 acres) than retail gas stations. Cardlocks are usually built in industrial areas that are easily accessible to trucks, rather than the more expensive sites used for retail gas stations. Cardlocks are open 24 hours a day, 365 days a year.

When using a cardlock, the customer must supply (and the supplier electronically captures) customer and billing information, including the date, time of day, vehicle odometer reading, and other miscellaneous information, as well as product type and gallons pumped. The supplier bills the customer for the gasoline and provides on the bill the detailed information captured at the pump. Most cardlocks have video surveillance for added security.

Petitioner operated the following five cardlocks in 1996 and 1997: 5750 South Watt Ave., Sacramento (Watt Avenue); 2891 Mosquito Road, Placerville (Mosquito Road); 4200 Roseville Road, North Highlands (Roseville Road); 11341 White Rock Road, Rancho Cordova (White Rock Road); and 4200 Mother Lode Drive, Shingle Springs (Mother Lode Drive). On September 1, 1997, petitioner leased the land for a sixth cardlock located at 1201 Fee Drive, Sacramento (Fee Drive).

Petitioner is a closely held corporation. Warren Hunt, Jr., and his wife, Anita Hunt, own 48 percent of the stock of petitioner; Randall Dean Hunt and his wife, Cynthia Hunt, own 26 percent of the stock of petitioner; Warren Hunt III and his wife, Rosemarie Hunt, own 26 percent of the stock of petitioner. Randall Dean Hunt and Warren Hunt III are the sons of Warren Hunt, Jr., and Anita Hunt.

Petitioner paid Federal corporate income taxes of $256,863 for 1996 and $350,456 for 1997. For each of 1996 and 1997, petitioner paid total dividends of $24,000.

Petitioner's shareholders, through revocable living trusts, own the raw land underlying all the cardlocks operated by petitioner.[2] Petitioner leases the raw land from its shareholders' revocable living trusts through ground leases. Petitioner owns the improvements and operates the cardlock businesses.

The operation of a cardlock business, which requires the use of underground storage tanks and pipes, entails a high degree of financial risk because of the potential for leaks, which can cause soil and groundwater contamination that can be very

---

[2]The Watt Avenue, Mother Lode Drive, and Fee Drive land is owned by the Warren N. Hunt III and Rosemarie A. Hunt Revocable Living Trust and the Randall Dean Hunt and Cynthia Lynne Hunt Revocable Living Trust. The Mosquito Road, Roseville Road, and White Rock Road land is owned by the Warren N. Hunt, Jr., and Anita M. Hunt Revocable Living Trust.

expensive to clean up.  In the mid-1980s, government regulators in California imposed strict new regulations on operators of underground storage tanks, requiring the use of double-wall tanks, double-wall piping, tank-monitoring devices, and leakage alarms.  Government regulators also require annual testing of the systems to prevent or minimize soil, groundwater, and air pollution. Petitioner spent $60,000 to clean up a leak at its Roseville Road site and has incurred expenses of more than $500,000 to clean up contamination at its Placerville plant.

Petitioner paid and deducted the following amounts as rent during 1996 and 1997 with respect to its cardlock locations:

| Property | 1996 | 1997 |
|----------|------|------|
| Watt Avenue | $120,000 | $120,000 |
| Mosquito Road | 55,200 | 53,400 |
| Roseville Road | 48,000 | 54,000 |
| White Rock Road | 54,000 | 55,500 |
| Mother Lode Drive | 27,600 | 28,800 |
| Fee Drive | -- | [1]16,000 |
| Total | 304,800 | 327,700 |

[1]The Fee Drive property was leased for only 4 months in 1997, at a rent of $4,000 per month.

The annual fair market rental value for both 1996 and 1997 of Watt Avenue was $89,700 and of Mother Lode Drive was $29,900. The fair market rental value of Fee Drive for the 4 months of 1997 (during which the property was leased to petitioner) was $10,400.  Respondent offered no evidence to contradict petitioner's and petitioner's experts' testimony that petitioner

paid fair market rental value for the other properties (Mosquito Road, Roseville Road, and White Rock Road).

ULTIMATE FINDINGS OF FACT

1.  Petitioner paid the following amounts to its shareholders in excess of the fair rental value of the properties:

| Property | 1996 | 1997 | Total |
|----------|------|------|-------|
| Watt Avenue | $30,300 | $30,300 | $60,600 |
| Fee Drive | -- | 5,600 | 5,600 |
| Total | 30,300 | 35,900 | 66,200 |

Petitioner paid fair market rental value for the other cardlock properties.

2.  Petitioner's payments in excess of the fair market rental value of the properties are not deductible in computing taxable income.

3.  Petitioner was not negligent in deducting rent in excess of the fair market rental value of the Watt Avenue and Fee Drive properties.

OPINION

The parties agree that potential for abuse is inherent in rental transactions between a corporation and its shareholders. As we stated in Wy'East Color v. Commissioner, T.C. Memo. 1996-136:

> A taxpayer generally may deduct reasonable rents paid for property used in a trade or business.  A taxpayer who rents property from a related person may not deduct more than he or she would have paid if the

> parties had dealt at arm's length.  A taxpayer may deduct only the fair rental value of premises it rents from related persons.  We closely scrutinize whether rents exceed fair rental value if the lessor and lessee are related. Fair rental value is a question of fact. * * * [Citations omitted.]

See also, e.g., Limericks, Inc. v. Commissioner, 165 F.2d 483, 484 (5th Cir. 1948), affg. 7 T.C. 1129 (1946); Associated Dentists v. Commissioner, T.C. Memo. 1998-287.  We must therefore determine whether (and if so, to what extent) the rents paid by petitioner to its shareholders, and deducted by petitioner, were in excess of the fair market rental values of the properties.

I.    Burden of Proof

Before enactment of section 7491 by the Internal Revenue Service Restructuring and Reform Act of 1998 (RRA), Pub. L. 105-206, sec. 3001(a), 112 Stat. 726, it would have been clear that respondent's determinations in the notice of deficiency of the fair market rental values of the properties were entitled to a presumption of correctness, and petitioner would bear the burden of proving that respondent's determinations were incorrect.  Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933); Wy'East Color v. Commissioner, supra.

The Court of Appeals for the Ninth Circuit has held that the presumption of correctness does not apply where the Commissioner takes a position in Court that abandons the determination in the notice of deficiency.  Morrissey v. Commissioner, 243 F.3d 1145

(9th Cir. 2001), revg. and remanding <u>Estate of Kaufman v. Commissioner</u>, T.C. Memo. 1999-119.

In the case at hand, the notice of deficiency does not segregate the portion of the excess rental expense disallowance attributable to each property for each year. We are therefore unable to determine, on a property-by-property basis, whether the appraisals of respondent's expert, Mr. Harris, are consistent with the determinations contained in the notice of deficiency.

Section 7491 shifts the burden of proof to the Commissioner if certain requirements are met. However, section 7491 applies only to court proceedings arising in connection with examinations commenced after July 22, 1998. RRA sec. 3001(c), 112 Stat. 727. Neither party offered evidence to show whether the audit in the case at hand was commenced before July 23, 1998. However, respondent claimed in his pretrial memorandum that the audit was commenced before July 23, 1998, and petitioner in its opening brief appears to accept respondent's allegation by asserting that it has met its burden of proof.

Both parties introduced evidence as to the fair market rental values of the Watt Avenue, Mother Lode Drive, and Fee Drive properties. The case at hand is not one of those rare cases in which the weight of the evidence adduced by the parties is in equipoise. We will therefore determine the fair market rental values of these properties on the basis of the

preponderance of the evidence rather than on an allocation of the burden of proof.

With respect to the White Rock Road, Roseville Road, and Mosquito Road properties, only petitioner introduced direct evidence regarding fair market rental value. In lieu of offering evidence, respondent asks us to infer that the rents on these properties were overstated in the same overall proportion as the rents on the other three properties. We decline to do so. As discussed infra, petitioner has established by a preponderance of the evidence that the rents paid on these properties did not exceed their fair market rental values.

II. Fair Market Rental Value of the Properties

In his notice of deficiency, respondent disallowed petitioner's rental deductions, in the gross amounts shown on the following table, with respect to the six properties under review:

|  | 1996 | 1997 | Total |
|---|---|---|---|
| Rent claimed | $304,800 | $327,700 | $632,500 |
| Rent disallowed by respondent | (203,600) | (211,620) | (415,220) |
| Rent allowed by respondent | 101,200 | 116,080 | 217,280 |

Respondent determined that the excess rents petitioner paid constituted disguised dividends. Respondent claims that petitioner's purpose in disguising the dividends as rental

expenses was to avoid the corporate income tax by converting nondeductible dividends into deductible rental expenses.

Section 162(a)(3) allows as a deduction all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including "rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property". In determining whether the payments here in issue were rental payments deductible under this section, the "basic question is * * * whether they were in fact rent instead of something else paid under the guise of rent." Place v. Commissioner, 17 T.C. 199, 203 (1951), affd. per curiam 199 F.2d 373 (6th Cir. 1952). In connection with a lease between related parties, the inquiry "requires a careful examination of the circumstances surrounding the rental of the property to determine the intentions of the parties in agreeing upon * * * [the] lease and in fixing the terms thereof." Davis v. Commissioner, 26 T.C. 49, 56 (1956). The question whether payments are rental payments within the meaning of the statute is a question of fact to be resolved on the basis of all the facts and circumstances. Thomas v. Commissioner, 31 T.C. 1009, 1012 (1959); S. Ford Tractor Corp. v. Commissioner, 29 T.C. 833, 842 (1958).

A.  The Fair Market Rental Value of Watt Avenue, Mother
    Lode Drive, and Fee Drive

Both parties submitted substantial evidence concerning the fair market rental value of three of the properties petitioner leased:  Watt Avenue, Mother Lode Drive, and Fee Drive.

Respondent submitted separate appraisal reports on each of the three properties prepared by Kenneth R. Harris, MAI, of Hopkins Appraisal Services, Inc., a national appraisal firm specializing in the appraisal of petroleum properties.  Mr. Harris used the same basic methodology for all three properties. First, Mr. Harris determined the fair market value of the land using only the cost approach to value, because he found both the market and income approaches to be irrelevant to the appraisal of raw land.  Under the cost approach, Mr. Harris determined the sale prices of four or five comparable properties and computed a sale price per square foot for each of the comparable properties. He then used his judgment to adjust the sale price per square foot of each of the comparable properties for perceived differences between the comparable properties and the subject. Very significant adjustments were made, leading us to question whether these properties were true "comparables". Adjustments on the Fee Drive property ranged from 20 to 60 percent and on the Mother Lode Drive property ranged from 15 to 40 percent.  One of the four "comparables" on the Watt Avenue property was adjusted by 65 percent.  It would be very easy to justify much higher or

lower values by making smaller or larger adjustments to the sale prices per square foot used in adjusting the comparable properties. Because the "comparables" used by Mr. Harris were so different from the subject properties, and thus required such significant discretionary adjustments in order to provide a basis for comparison, we are left with some doubt about the reliability of Mr. Harris's conclusions. Presumably, these were the most "comparable" properties that Mr. Harris was able to find.

Next, Mr. Harris used the adjusted per-square-foot values for the "comparable" properties to determine the value of the subject properties. For two of the properties (Watt Avenue and Fee Drive), Mr. Harris computed an average adjusted price per square foot for the "comparable" properties, which was rounded up to the nearest whole dollar amount per square foot. For the remaining property (Mother Lode Drive), Mr. Harris eliminated the high and low comparable values and used a whole dollar amount in the range of the remaining three values.

Mr. Harris then computed a fair market value for the subject properties by multiplying the per-square-foot values he determined from his average or median adjusted "comparable" properties by the number of square feet of each of the subject properties.

After deriving a current fair market value for the subject properties, Mr. Harris computed the annual fair market rental

value of the properties by applying a flat 10-percent "capitalization" rate to the fair market value.[3]  Mr. Harris based his "capitalization" rate on conversations with several people who had experience with ground leases with major oil companies, all of whom indicated that annual ground lease rates were a flat 10 percent of the current fair market value of the land.[4]  Mr. Harris made no adjustment in the rental

[3]The parties' experts referred to the rate applied to the fair market value to compute the first year's annual rent as a "capitalization rate".  A true capitalization rate is a rate used to convert a perpetual stream of income into a discounted present value.  Narver v. Commissioner, 75 T.C. 53, 91 n.17 (1980), affd. 670 F.2d 855 (9th Cir. 1982); Lanier v. Commissioner, T.C. Memo. 1998-7.  We nevertheless recognize that it is common practice to refer to both the capitalization rate and its inverse as the "cap rate".

[4]Mr. Harris's appraisal (and the appraisals of the other experts) did not take into account that these properties were subject to existing ground leases, some of which were made in earlier years.  For example, the Watt Avenue lease was entered into in 1990 and provided for annual escalations based on increases in the consumer price index, none of which were apparently made.  Instead of determining the rent for the years in issue on the basis of market conditions existing at the time the leases were entered into, Mr. Harris determined the current fair market lease rate for a new lease.  The parties should have taken into consideration any change in market conditions.  "[A] transaction must not be disregarded simply because it was not at arm's length."  Sun Props., Inc. v. United States, 220 F.2d 171, 174 (5th Cir. 1955).  Our role is merely to limit deductions to the amount that would have been paid if the parties had entered into the transactions at arms length.  "In the absence of arm's length negotiations 'an inquiry into what constitutes reasonable rental is necessary to determine whether the sum paid is in excess of what the lessee would have been required to pay had he dealt at arm's length with a stranger.'"  Sparks Nugget, Inc. v. Commissioner, 458 F.2d 631, 635 (9th Cir. 1972) (quoting Place v. Commissioner, 17 T.C. 199, 203 (1951), affd. 199 F.2d 373 (6th
(continued...)

"capitalization" rate for the greater risks involved in leasing property for use as a cardlock operation to a small independent operator, such as petitioner, rather than to a major oil company.[5]

Using this methodology, Mr. Harris determined the fair market value and fair market rental value for the three properties to be as follows:

| Property | Fair Market Value | Capitalization Rate | Fair Market Rental Value |
|---|---|---|---|
| Watt Avenue | $690,000 | 10% | $69,000 |
| Fee Drive | 240,000 | 10 | 24,000 |
| Mother Lode Drive | 230,000 | 10 | 23,000 |

Petitioner's experts criticized Mr. Harris for failing to account for the significant risks a landlord undertakes when leasing property to an independent cardlock operator. According to their uncontradicted testimony, underground petroleum storage tanks have a history of leaking, causing soil and groundwater contamination that must be remediated at significant cost. While

[4](...continued)
Cir. 1952)), affg. T.C. Memo. 1970-74. The validity and amount of allowed deductions should not depend on changes in market conditions occurring after the parties' contractual arrangements were set. Because neither party offered evidence of changes in market conditions, we will assume that market conditions did not change between the lease date and the years in issue.

[5]Petitioner's witnesses made a strong showing that leasing property for use as a gas station carries with it significant risks for the lessor, risks not taken into account in Mr. Harris's analysis.

current double-hull tanks provide much greater protection against leaks, significant risks still exist.  Both the owner of the land and the tenant are liable under California law for the cost of cleanup, even through the tenant whose tanks leak generally is liable under the terms of the lease or under California's equitable indemnity laws to reimburse cleanup costs paid by the landlord.  See, e.g., Meghrig v. KFC Western, 516 U.S. 479 (1996) (reciting that owner ordered by California regulatory authorities to clean up prior owner's petroleum contamination); First San Diego Properties v. Exxon Co., 859 F. Supp. 1313 (S.D. Cal. 1994) (innocent current owner seeking indemnity from prior owner and operator who caused contamination is not liable to prior operator for contribution); Zands v. Nelson, 797 F. Supp. 805 (S.D. Cal. 1992) (owner and operator jointly and severally liable to clean up petroleum contamination); Mangini v. Aerojet-Gen. Corp., 227 Cal. App. 3d 1248, 1273-1274 (1991) (doctrine of equitable indemnity under California law).  Because of the substantial cost of cleaning up soil and groundwater contamination, the landlord assumes significant risk when the tenant does not have the financial wherewithal to respond in damages for the cost of cleaning up a petroleum leak.

In addition, property containing underground petroleum storage tanks may become stigmatized because of concern of potential buyers about soil and groundwater contamination.

Stigmatization can cause a reduction in the value of the property even when the environmental hazards have been remediated or mitigated. See In re Custom Distribution Servs., Inc., 216 Bankr. 136, 154-155 (Bankr. N.J. 1997) (reducing fair market value of property by 20 percent to account for environmental stigma); Inmar Associates Inc. v. Borough of Carlstadt, 549 A.2d 38, 45 (N.J. 1988) ("not reasonable to conclude that contaminated property is unmarketable, but stigma of contamination and other factors suggest that capitalization rate may have to be altered to reflect condition" (citing Patchin, "Valuation of Contaminated Properties", The Appraisal Journal 7 (Jan. 1988))).

A landlord takes on much greater risk when leasing property to an independent operator of cardlocks (such as petitioner) than when leasing the same property to a major oil company, because of the difference in the lessee's financial strength. An independent operator may not have the financial wherewithal to respond to a significant environmental problem, which would leave the landlord primarily liable for the cost of the cleanup. A landlord would thus likely require a greater return (by requiring the payment of more rent) when leasing property to a small independent operator of underground storage tanks than when leasing the same property to a major oil company.

The additional credit risk assumed by a landlord leasing property to an independent cardlock operator rather than a major

oil company should be reflected in the "capitalization" rate, or otherwise accounted for in determining the fair market value and fair market rental value of the property. Cf. In re Custom Distribution Servs., supra at 155 n.17 ("The New Jersey Supreme Court appears to favor an approach that accounts for the stigma of environmental contamination via an adjustment to the capitalization rate".); Inmar Associates, Inc. v. Borough of Carlstadt, supra at 45 (suggesting that environmental stigma should be reflected in higher capitalization rate).

Mr. Harris improperly used a flat 10-percent "capitalization" rate, relying on information concerning the "capitalization" rates used in leases between landowners and major oil companies. We disagree with Mr. Harris's use of a flat 10-percent "capitalization" rate in light of the special risks borne by the lessor when leasing property to an independent cardlock operator. We also have greater uncertainty about Mr. Harris's conclusions than we would if the "comparable" properties were more similar to the subject properties. Despite these misgivings, we give substantial weight to Mr. Harris's conclusions of value because his report is professionally prepared, he is well qualified to make adjustments to equate the comparable properties, and he fully disclosed his methodology and analysis.

We cannot say the same of the reports submitted by petitioner's experts. Petitioner submitted reports from two experts: Patrick D. McIntosh, a licensed appraiser for McIntosh & Associates, and Skip Vanderbundt, a real estate agent and senior vice president of Cornish & Carey Commercial. Mr. McIntosh supported his testimony with two reports: A "narrative summary restricted report" (restricted report) in which Mr. McIntosh had appraised, for estate-planning purposes, the land both raw and improved, and a "summary consulting report" (consulting report) in which Mr. McIntosh determined the fair market rental value of the properties leased by petitioner. Both reports reach conclusions of value without providing any support or analysis for the conclusions. The restricted report describes the real property and states a conclusion of value. Nothing is expressed in the report to support Mr. McIntosh's conclusion of value. In the consulting report, Mr. McIntosh concludes that petitioner's leases are all within the range of fair market rental values on the basis of one identified lease, known as the Nella Oil lease, and Mr. McIntosh's knowledge of other lease transactions, the specific terms of which, Mr. McIntosh says in the report, he cannot disclose.

In cross-examination and through the testimony of Mr. Harris, respondent established that the Nella Oil property is superior in every way to petitioner's properties. It is a highly

visible property in a prime location and is used as a retail gas station, convenience store, and cardlock operation. Mr. McIntosh discloses no analysis to adjust for the superiority of the Nella Oil lease. He simply attempts to justify petitioner's lease rates by pointing out that the rent per square foot paid by Nella Oil is higher than the rent per square foot paid by petitioner.

Mr. McIntosh criticized Mr. Harris's report, arguing that it is not appropriate to apply a capitalization rate to the fair market value of the property to derive the fair market rental value of the property. Yet in a letter to petitioner dated December 8, 1999, criticizing an Internal Revenue Service engineer's report in a prior dispute,[6] Mr. McIntosh stated that

---

[6]Petitioner provided a copy of Mr. McIntosh's letter to the Internal Revenue Service. Respondent used this letter at trial for impeachment purposes. Mr. McIntosh testified at trial that he reviewed Mr. Vanderbundt's report and found it to be a sound basis for determining the fair rental value of the subject properties. Mr. Vanderbundt relied entirely on a single "comparable" lease for property in Lodi, California, which is 23 miles south of Sacramento, California, near Stockton, California. Mr. McIntosh was asked at trial whether the Modesto and Stockton areas are comparable to Sacramento:

> A:   Some of the areas around Modesto and Stockton, and
>      I'm familiar with those areas, because I do
>      appraising in that area, would be familiar
>      [similar] with many of the areas around the
>      Sacramento metropolitan area.
>
>      *    *    *    *    *    *    *
>
> Q:   Mr. McIntosh, would you ever attempt to use a
>      comparable from areas like Modesto or Stockton for a
>      property in Sacramento?

(continued...)

---

[6](...continued)
A:    It would depend on the kind of property.  I think of
      some times when they would be very comparable.

Yet in his December 8, 1999, letter criticizing respondent's
engineer's report, Mr. McIntosh stated:

> The IRS appraiser appears to feel that the Modesto/
> Stockton areas are equal to the Sacramento area.  He is
> either unaware or does not mention that the former
> areas have been economically depressed for some time,
> while the Sacramento area has been rebounding.  I
> regularly appraise stations and mini marts in all of
> these cities.  I do not consider them equivalent, <u>nor
> would I ever attempt to use comparables from areas like
> Modesto or Stockton for a property in Sacramento</u>."
> [Emphasis added.]

At trial, Mr. McIntosh also sought to justify the
conclusions reached by Mr. Vanderbundt in his report by stating
that he thought the Vanderbundt report was well prepared and
would meet the requirements for a professional appraisal if Mr.
Vanderbundt were licensed as an appraiser.  As discussed in more
detail below, Mr. Vanderbundt used as a "comparable" a single
lease transaction between related parties, not an arm's-length
transaction.  Mr. McIntosh testified that it is appropriate for
an appraiser to use a related-party lease as a comparable if he
could "verify the information, and see that it's factual, and
that it is pretty much parallel with the rest of the market data
that you've got."

While it may be acceptable to mention a related-party
transaction as additional support for an appraisal, it is clearly
improper for an appraiser to rely solely on a related-party lease
in determining the fair market value of another property.  The
purpose of an appraisal is to determine fair market value of the
subject property.  Fair market value is the price a willing buyer
would pay to a willing seller in an arm's-length transaction,
with neither party being under compulsion to buy or sell, and
both having reasonable knowledge of the facts.  <u>United States v.
Cartwright</u>, 411 U.S. 546, 551 (1973); <u>Morris v. Commissioner</u>, 70
T.C. 959, 988 (1978).  A related-party transaction is, by
definition, not an arm's-length transaction and thus does not
provide reliable evidence of the fair market value of the
"comparable" property.  Mr. McIntosh's inconsistent positions

(continued...)

"the recent lease negotiated with the Nella Oil Company in West Sacramento * * * gives a Cap Rate of 13%, a 13% range is deemed reasonable and meaningful for comparable purposes." Mr. McIntosh also testified at trial that the Nella Oil lease would result in a capitalization rate of "someplace in the neighborhood of 12 to 13 percent."

Mr. McIntosh faced a difficult problem in attempting to justify petitioner's rental rates because he had previously valued the properties for estate-planning purposes at low values.[7] Mr. McIntosh's fair market value determinations in his estate-planning appraisal were even lower than respondent's fair market value determinations, as shown in the following chart:

---

[6](...continued)
regarding the comparability of property in Modesto or Stockton with Sacramento, depending on whether the analysis supports or contradicts his client's position, and his suggestion that it would be proper for an appraiser to rely solely on a single related-party comparable in determining the fair market value of the subject property, call into question the independence of his analysis.

[7]Presumably, petitioner and its shareholders wanted conservative values for estate-planning purposes, so as to minimize gift and estate taxes. Mr. McIntosh was already bound by the conservative fair market value determinations he used in his estate-planning appraisal. It is, of course, easier to justify higher rental rates with higher property values.

| Property | Respondent's Appraisal (Mr. Harris) | Petitioner's "Estate-Planning" Appraisal (Mr. McIntosh) |
|---|---|---|
| Watt Avenue | $690,000 | $674,000 |
| Fee Drive | 240,000 | 225,000 |
| Mother Lode Drive | 230,000 | 60,000 |
| Total | 1,160,000 | 959,000 |

Mr. McIntosh did not attempt to apply a "capitalization" rate to his estate-planning values in order to justify petitioner's rental rates because such a high "capitalization" rate could not be supported. Instead, Mr. McIntosh testified that there is no consistent relationship between the value of land and the rental value of land, and that "the use of a hypothetical cap rate * * * can only do one thing, and that's get you an inaccurate, unrealistic conclusion." This is because, Mr. McIntosh claims, a tenant will pay more than the fair market rent determined through the application of a "capitalization" rate applied to the fair market value of the property if the tenant can earn a profit at the higher rent.

We do not find Mr. McIntosh's testimony credible in this respect. The fair market value of the land reflects the highest and best use of the property. The "capitalization" rate reflects the rate of return that the owner would require from, and that a tenant would pay to lease, the land. The "capitalization" rate reflects prevailing market interest rates for risk-free investments, together with a risk premium that takes into account

the risks of the transaction, including the risks involved in the

particular real estate activities in which the tenant proposes to

engage.  See Narver v. Commissioner, 75 T.C. 53, 91 n.17 (1980),

affd. 670 F.2d 855 (9th Cir. 1982); Lanier v. Commissioner, T.C.

Memo. 1998-7 ("The "capitalization" rate * * * Although basically

related to the rate of interest * * * includes risk and liquidity

factors").  A properly computed fair market value and

"capitalization" rate reflect competitive market conditions.  Mr.

McIntosh's suggestion that a "capitalization" rate is properly

used to determine fair market value from known rental rates but

not the other way around is inconsistent with basic mathematical

and appraisal principles.[8]  Mr. McIntosh's testimony is also

inconsistent with the methodology he used in his December 8,

1999, letter criticizing respondent's methodology.

We have previously recognized the appropriateness of using

"capitalization" rates to determine the fair market rental value

of real estate.  For example, in Clairton Slag, Inc. v.

Commissioner, T.C. Memo. 1979-485, we stated:

> inasmuch as no comparable leases were available from
> which to extrapolate the fair rental value of the
> Property, the next best method for determining the fair
> rental value of the Property is the "comparable sales"
> method (CSM).  The CSM requires the identification of
> two relevant figures:  (1) the rate of return on

---

[8]If the present value of the property equals the rental
value divided by the "capitalization" rate, then, as a matter of
algebra, the rental value must equal the present value multiplied
by the "capitalization" rate.

investment an unrelated lessor of comparable property would require; and (2) the fair market value of the subject property at the beginning of each lease year. * * *

Similarly, in <u>Osterlund, Inc. v. Commissioner</u>, T.C. Memo. 1987-40, we stated:

All three of these experts used essentially the same method to derive their estimates of the Property's fair rental value. They first estimated the Property's fair market value using comparable sales of property. They then multiplied their estimates of the Property's fair market value by a rate of return they believed a lessor of property similar to the Property would have required during the years in question upon leasing such property in an arm's-length transaction. We agree with the parties that this is a reasonable method for determining the fair rental value of the Property.

We are not bound by the opinion of any expert witness and may accept or reject expert testimony in the exercise of sound judgment. <u>Helvering v. Natl. Grocery Co.</u>, 304 U.S. 282, 295 (1938); <u>Estate of Hall v. Commissioner</u>, 92 T.C. 312, 338 (1989).

We give very little weight to Mr. McIntosh's testimony because his reports contain no analysis and little reliable data to aid us in determining the fair market rental value of the subject properties, and because his testimony on a number of matters was simply not credible.

We also give little weight to Mr. Vanderbundt's report. Mr. Vanderbundt's report was based on a single "comparable" to support his rental rate conclusions. His "comparable" was a lease between related parties for a property in Lodi, California, which had been supplied to him by petitioner. This single

related-party lease does not provide reliable information concerning fair market values.

However, we do agree with Mr. McIntosh's and Mr. Vanderbundt's testimony that the "capitalization" rate used in determining the fair market rental value of property should reflect the additional risks incurred by a landlord in leasing land to an independent cardlock operator such as petitioner, rather than a major oil company. We find that a 13-percent "capitalization" rate is an accurate assessment of the rate of return that an arm's-length lessor would have required from petitioner during 1996 and 1997. A "capitalization" rate of 13 percent is in the range of rates suggested by Mr. McIntosh in his December 8, 1999, letter, and is in the upper range of rates that Mr. McIntosh claims would be derived from the Nella Oil lease, which was entered into in the same general timeframe as petitioner's leases and was to a similar independent operator.

Mr. Harris credibly testified that a flat 10-percent rate would be appropriate for leases to major oil company tenants. However, the 10-percent rate fails to take into account the environmental credit risks borne by a landlord when leasing property to an independent cardlock operator. A 3-percent risk premium seems appropriate to us, in light of the substantial additional risks a landlord incurs when leasing property to an independent operator of underground storage tanks. Therefore, we

will apply a 13-percent "capitalization" rate in determining the fair rental value of the properties.

Using the market values determined by Mr. Harris (values that petitioner's expert, Mr. McIntosh, conceded were, if anything, on the high side), and using a "capitalization" rate of 13 percent, we conclude that the fair market rental values of the properties were as follows:

| Property | Fair Market Value | Capitalization Rate | Fair Market Rental Value |
|---|---|---|---|
| Watt Avenue | $690,000 | 13% | $89,700 |
| Mother Lode Drive | 230,000 | 13 | 29,900 |
| Fee Drive | 240,000 | 13 | 31,200 |

Petitioner is not entitled to deduct the amounts paid as rent in excess of the fair market rental value of the property. The excess amounts paid as rent were in the following amounts:

| Property | Rent Paid | | Fair Market Rent | | Excess |
|---|---|---|---|---|---|
| | 1996 | 1997 | 1996 | 1997 | |
| Watt Avenue | $120,000 | $120,000 | $89,700 | $89,700 | $60,600 |
| Mother Lode Drive | 27,600 | 28,800 | 29,900 | 29,900 | --- |
| Fee Drive | --- | [1]16,000 | --- | [2]10,400 | 5,600 |
| Total | 147,600 | 164,800 | 119,600 | 119,602 | 66,200 |

[1]The Fee Drive property was leased for only 4 months in 1997, at a rent of $4,000 per month.

[2]Inasmuch as the Fee Drive property was leased for only 4 months, we have used four-twelfths of the annual fair market rental value.

B.  Fair Market Rental Value of Remaining Properties

To show that the rents petitioner paid on the remaining properties were fair market rents, petitioner offered the testimony of its president and shareholder, Randall Dean Hunt, and the opinions of Messrs. McIntosh and Vanderbundt.  Respondent offered no evidence to contradict petitioner's position or the testimony of its expert witnesses.  At trial, respondent's expert, Mr. Harris, testified that he had appraised all six properties.  When the Court asked respondent how it was to determine the fair market rental values of the remaining three properties when respondent had not filed Mr. Harris's appraisal reports with respect to these properties, respondent's counsel replied:

> Your Honor, to be perfectly honest with you, respondent was prepared to concede that the other three properties' rental rates were reasonable.
>
> However, upon receiving Mr. McIntosh's reports, we kind of concluded that perhaps looking at just Mr. McIntosh's reports, and Mr. Vanderbundt's report, that maybe they weren't so reasonable.  And that's why we're not willing to concede that point at this point.
>
> But I think Mr. Harris concluded that they were reasonable, and we didn't feel that there was any need to submit his reports to the Court.

Respondent offered no evidence to suggest that the rents paid by petitioner on the remaining three properties exceeded their fair market rental values.  Respondent asks us to infer that petitioner must also have paid excess rents on the other three

properties because petitioner paid rents in excess of fair market rental value on two of the three properties for which respondent submitted evidence.[9]  We do not draw the inference respondent asks for.

Petitioner is entitled to prevail if a preponderance of the evidence shows that the rents paid were not in excess of the respective fair market rental values of the remaining properties. Petitioner has come forward with evidence to show that the rental rates it paid represented fair market rental values for the remaining three properties.  Petitioner submitted testimony from its president and two expert witnesses to support its rental values.  Because respondent failed to submit any contrary direct evidence, a preponderance of the evidence supports petitioner's position.

While the preponderance of the evidence supports petitioner's rental rates, we are not entirely satisfied by the evidence presented by the parties.  Petitioner's evidence was subject to all the infirmities noted above with respect to the expert testimony of Messrs. McIntosh and Vanderbundt.  We refer specifically to the fair market values of the remaining properties found by Mr. McIntosh in his original report for estate planning purposes, which, we have no doubt, were

---

[9]Of course, respondent asserted at trial and on brief, without submitting any evidence to support his assertion, that the rents for the three remaining properties were excessive.

substantially understated, and to the complete lack of data and analysis contained in the expert reports offered by petitioner. Using Mr. McIntosh's "estate-planning" appraisal values, as respondent requests, and our 13-percent "capitalization" rate would have resulted in very substantial excessive rents.[10] We believe this is attributable to Mr. McIntosh's undervaluing of the properties for estate-planning purposes rather than to petitioner's overstating of the rents.

While we would have preferred to base our decision on a record containing expert testimony supported by complete data and thorough, unbiased analysis, we must to do the best we can with the evidence presented by the parties. We are comforted in the correctness of our conclusion that petitioner paid fair market rents for the remaining three properties by respondent's admission that Mr. Harris, respondent's expert, had concluded that the rents for these three properties were not excessive.[11]

---

[10]Applying a 13-percent "capitalization" rate to Mr. McIntosh's fair market values would have resulted in fair market rent of $18,200 per year for Mosquito Road, $32,500 for Roseville Road, and $33,800 for White Rock Road. Using these fair market rental values, petitioner would have overstated the fair market rents for these three properties for the 2 years in issue by $151,100.

[11]Because respondent's appraiser used a flat 10-percent "capitalization" rate to determine fair market rental value, respondent's expert must have determined fair market values exceeding $530,000 for Mosquito Road, $540,000 for Roseville Road, and $550,500 for White Rock Road--many times the values determined by Mr. McIntosh (who valued the properties at

(continued...)

We therefore find that the rents petitioner paid on the remaining properties did not exceed the fair market rental values of the properties.

III. Penalties

Respondent argues that petitioner should be liable for a 20-percent accuracy-related penalty by reason of petitioner's negligence under section 6662(a)(1). Respondent claims that the magnitude of the discrepancy between the rent paid and the fair market rental value of the properties establishes negligence. Respondent offers no other evidence of negligence than the magnitude of the discrepancy.[12]

Respondent argues that a negligence penalty is mandated where the taxpayer fails to offer credible independent evidence

---

[11](...continued)
$140,000, $250,000, and $260,000, respectively). Even using a 13-percent "capitalization" rate would result in values of $410,769, $415,384, and $426,923 for Mosquito Road, Roseville Road and White Rock, respectively. Under any scenario, Mr. McIntosh's "estate-planning" appraisal substantially undervalued the properties.

[12]In connection with additions to tax and penalties, sec. 7491(c) places a burden of production on the Commissioner in cases involving examinations commenced after July 22, 1998. Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001, 112 Stat. 726. Neither party offered evidence to show when the audit was commenced. However, respondent claimed in his pretrial memorandum that the audit was commenced before July 23, 1998, and petitioner in its opening brief appeared to accept the burden of proof. Whether sec. 7491(c) applies here is irrelevant because petitioner is entitled to prevail on a preponderance of the evidence.

to show how the lease rents were determined, citing <u>Duplicating Supply Co. v. Commissioner</u>, T.C. Memo. 1993-451.

In <u>Duplicating Supply</u>, the Court recognized that the taxpayer had the burden of establishing that it was not negligent in setting the rent for the property, as the Commissioner had determined in the notice of deficiency. The taxpayer had substantially overstated rent (charging for 1 year's rent 44 percent of the fair market value of the property), had made no investigation of the market before setting the rent, and offered no explanation to show how the rental figure had been determined.

The case at hand is easily distinguished from <u>Duplicating Supply</u>. The uncontradicted evidence indicates that petitioner made efforts to determine the correct rents by contacting real estate agents before setting the rents. Petitioner's president and shareholder, Randall Dean Hunt, testified that before entering into each of the leases, he (or his father before him) asked several different brokers whether the rental rate was reasonable.

Respondent argues that even though Mr. Hunt named the brokers he and his father spoke with, Mr. Hunt's testimony was self-serving and should be disregarded because petitioner did not call the brokers as witnesses. Respondent asks us to disregard Mr. Hunt's testimony because it is self-serving and uncorroborated by any independent witnesses, citing <u>Wichita</u>

<u>Terminal Elevator Co. v. Commissioner</u>, 6 T.C. 1158, 1165 (1946), affd. on other grounds 162 F.2d 513 (10th Cir. 1947).

In <u>Wichita Terminal</u>, we recognized that the Commissioner has no obligation to introduce evidence to rebut an allegation by the taxpayer where the taxpayer failed to introduce "one scintilla of evidence" to support its allegation. In that case, we stated: "The rule is well established that the failure of a party to introduce evidence within his possession and which, if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable." <u>Id.</u> However, as we stated in <u>Sisson v. Commissioner</u>, T.C. Memo. 1994-545:

> This rule originates in Lord Mansfield's observation that "all evidence is to be weighed according to the proof which it was in the power of one side to have produced, and in the power of the other to have contradicted." <u>Mammoth Oil Co. v. United States</u>, 275 U.S. 13, 51 (1927) (quoting <u>Blatch v. Archer</u>, 1 Cowper 63, 65 (1774)); <u>Kirby v. Tallmadge</u>, 160 U.S. 379, 383 (1895). What Lord Mansfield did not say, but what the Supreme Court added, is that the rule is to be applied cautiously, and only in cases where the evidence is possessed by one party and not accessible to the other party. <u>Mammoth Oil Co. v. United States</u>, <u>supra</u> at 51. This qualification mitigates the rigor with which the rule might otherwise restrict the ability of the parties to present their cases as they choose; the qualification makes clear that, in our judicial system, the trial court's role is to decide cases on the evidence presented, not on imaginable "evidence" not presented. Fuller, The Problems of Jurisprudence 706 (Temp. ed. 1949) ("the moral force of a judgment of decision will be at a maximum when * * * The judge decides the case solely on the basis of the evidence and arguments presented to him").

In the case at hand, the witnesses to the conversations were equally available to petitioner and respondent. Petitioner was not required to call witnesses to corroborate the testimony it offered. If respondent did not believe the testimony, he should have called witnesses or taken other discovery to impeach Mr. Hunt's testimony. Respondent offered no evidence to call into question the truth of Mr. Hunt's testimony.

In addition, the magnitude of the discrepancy is not nearly as significant as it was in Duplicating Supply Co. v. Commissioner, supra. We have found that petitioner overstated rent on only two of the six properties and charged as total annual rent less than 20 percent of what we have found (and what respondent's expert claimed) to be the fair market value of these properties.[13] Petitioner's rental payments exceeded the fair market rental value of the Watt Avenue property by approximately 33 percent and the Fee Drive property by approximately 53 percent. While petitioner did overstate rental deductions on these two properties, we do not find that the overstatements were of sufficient magnitude to mandate a determination that petitioner was negligent in setting the rents. We therefore

---

[13]In 1996, petitioner charged rent of $120,000 for Watt Avenue on a value of $690,000, resulting in a rental rate of 17 percent of value. In 1997, petitioner charged $120,000 in rent for Watt Avenue and annualized rent of $48,000 on Fee Avenue, for total rent of $168,000 on a value of $930,000 or approximately 18 percent of value.

conclude that petitioner is not liable for an accuracy-related penalty on the grounds of negligence under section 6662(a)(1).

After giving effect to the parties' concessions,

<u>Decision will be entered under Rule 155</u>.